[Crim. No. 752.   Fourth Dist.   June 22, 1951.]

THE PEOPLE, Respondent, v. CHARLES ARTHUR GREBE, Appellant.

Charles Elwyn Karpinski and Ann Wansley for Appellant.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged, in separate counts, with robbery, with failing to perform the duties required by section 480 of the Vehicle Code, and with assault with a deadly weapon with intent to commit murder. He pleaded not guilty, and not guilty by reason of insanity. Shortly before the trial he moved, under section 1368 of the Penal Code, for an order suspending proceedings, and for a jury trial on the question of his present sanity. After a hearing this motion was denied. He then withdrew his plea of not guilty, and a jury found him sane at the time the offenses

were committed. He has appealed from the judgment and from an order denying his motion for a new trial.

The appellant was a dental technician, first class, in the United States Navy, and was stationed in San Diego. On October 21, 1950, he purchased a gun, to be delivered the next day. On October 22, he talked about the gun several times to a waitress in a café, saying he did not know what to do with it as he did not have a permit to carry it. He got the gun about 4 p. m., and the waitress persuaded him to put it in his locker in a near-by locker club. He kept talking about the gun, told her he wanted to kill somebody, and took the gun out of the locker two or three times but she persuaded him to put it back. He left this waitress about 6:15 p. m.

Shortly after 7 p. m. he used the gun to take a car from the owner, in downtown San Diego, telling the owner that he needed the car because he had to go to Los Angeles. A few minutes later, while driving down Broadway, he struck and injured a boy who was crossing the street at a marked cross-walk, and drove on without stopping. At about 8 p. m. he left the stolen car in La Jolla, and persuaded the driver of another car to take him to a bar and buy him a drink. They then went for a drive during which the appellant took out the gun and told the other man he thought of killing him but would not do so because "you bought me a drink." When asked why he wanted to do that he replied that he had already killed two people that night. As they were returning to the business district of La Jolla an officer on a motorcycle approached from the rear, on his way to assist in a road block being set up to catch the appellant. When the appellant saw the officer approaching he stepped on the brake. The other man jumped out and yelled for help. The appellant also got out and, while the officer was resting his motorcycle on its stand, fired five shots two of which struck the officer. The appellant then ran up a hill and hid in some bushes. He was arrested about an hour later as he approached a bus stop in La Jolla.

On the way to the police station he expressed concern as to whether the officer he had shot had a family, and asked whether or not capital punishment was used in this state. He was questioned at the police station, his statements being taken down by a shorthand reporter. He gave a detailed statement of all that had occurred, claiming he was drunk, and expressed regret at having struck the boy. He said that when the motor-cycle officer approached and the driver of the car yelled for

help he was desperate and shot so he would have a chance to run for the bushes. He also said that he shot at the motorcycle, and that these were warning shots to keep the officer from chasing him. He stated that he had taken the car in San Diego because he hated the Navy and wanted to get away from it.

At the trial, witnesses who had seen the appellant on October 22, including the owner of the stolen car, the driver of the second car, and the officers who talked with him that evening, testified as to his actions and statements. All of them said he was not drunk when they saw him. There was evidence that he had been in the Navy about nine years, a part of the time on the reserve list; that during World War II he spent some months in two hospitals, being diagnosed as having "Occupational fatigue"; that after World War II he studied to become a mortician and passed the examination; that after working a while at that trade he had been recalled to active service; and that his work in the Navy was of a highly satisfactory character. Copies of his medical reports while in the Navy were introduced in evidence.

Five doctors testified. One was a Navy doctor who explained the appellant's naval hospital records, and testified that he saw no evidence of psychosis in appellant's actions as shown by the records. Three were called by the appellant, two of them having been appointed by the court. The fifth was called in rebuttal by the prosecution. All of the defense doctors agreed that the appellant was not "psychotic" at the time they examined him or at the time of the trial. One of them testified that he showed signs of a psychopathic personality, meaning that when confronted with problems of everyday living he at times found himself incapable of adjusting himself to ordinary standards; and that in his opinion he was psychotic and did not know the difference between right and wrong at the times these crimes were committed. The main reason he gave for this opinion was that his behavior on the occasion in question was erratic and impulsive and he had nothing to gain from it. While he stated that the appellant's behavior after he stole the car was such as might be attributable to either a normal person or a psychotic one, he stated that he concluded that if the appellant had been sane he probably would have shot more accurately at the motorcycle officer. Another of these doctors, who had been appointed by the court, expressed the opinion that the appellant did not know the difference between right and wrong at the times in

question because he thought the appellant was probably then "suffering from an abnormal state of intoxication, pathological intoxication." He explained that pathological intoxication is a condition following the consumption of alcohol and associated with very abnormal or very unusual conduct whereas ordinary intoxication is associated with belligerent and aggressive acts. The third of these doctors, also appointed by the court, testified that he thought the appellant had a psychopathic personality "with psychotic episodes" and that at such times he believed the appellant was, quite likely, psychotic; that it was very difficult to say whether the appellant knew the difference between right and wrong at the time in question, that "possibly he did not know the difference between right and wrong but we have no way of accurately determining it"; that the appellant's behavior at the time in question might be compared to a person who is under the influence of alcohol or what might be called a pathological intoxication; and that while such people appreciate at the time that what they are doing is wrong they go ahead and carry out these antisocial acts. He admitted that the desire to have an automobile would constitute a motivation for stealing a car and that a hurried departure after stealing a car, a hit and run, and an attempt to escape from an officer after committing these crimes would not be psychotic. He finally testified that it was quite possible that the appellant knew that he was doing wrong and that part of his acts were caused by fear and panic. The doctor called in rebuttal by the prosecution testified, from an examination of the medical records of the appellant and in response to a hypothetical question based upon a summary of his actions which resulted in these charges, that he saw no evidence that the appellant was psychotic. He concluded, on the basis of the facts presented to him that the appellant was a psychopathic personality, and that while he had periods of emotional outbursts he was able to distinguish between right and wrong and appreciated the nature and quality of his acts during such periods.

The appellant first contends that the court erred in denying his motion to have the question of his present sanity submitted to a jury, under section 1368 of the Penal Code. At the hearing on this motion two psychiatrists testified. One of them testified that at the time he saw the appellant "I couldn't make a diagnosis of a psychosis within the meaning of the law." The other testified that the appellant is a psychopathic personality with antisocial trends, and that "I would

hesitate to state that he is psychotic at this particular time.''
While both doctors stated that the appellant was emotionally
unstable neither would state positively that he considered the
appellant unable to assist his attorneys in a rational defense of
the case. With the permission of counsel the appellant was
himself called to the stand and the judge asked him many
questions concerning his past life and service in the Navy,
all of which he answered with a rather unusual showing of
clarity and intelligence. While conceding that the doubt here
involved must be one arising in the mind of the trial judge
(*People* v. *Perry,* 14 Cal.2d 387 [94 P.2d 559, 124 A.L.R.
1123]) it is argued, citing *People* v. *West,* 25 Cal.App. 369
[143 P. 793], that where there are statements under oath of
a credible person that the defendant is insane a doubt arises
as a matter of law. In *People* v. *West,* the defendants com-
mitted the crime while confined in a state hospital for the
insane, where they had been but for a short time, and the
statement under oath there involved disclosed that the de-
fendants could not, or would not, say anything to their attor-
neys about the facts of the case. No abuse of discretion here
appears.

It is next contended that the court was guilty of
prejudicial misconduct in questioning the witnesses for the
appellant. While conceding the right of the court to ask a
few questions of the witnesses, it is contended that this was
here done so extensively as to indicate that the court assumed
the guilt of the defendant, and that the court thus disclosed
to the jury that he discredited the appellant's witnesses, had
no confidence in his case, and believed him guilty. The argu-
ment on this point covers 63 pages of the appellant's briefs
and it is unnecessary to review it in detail.

Nearly all of these questions were asked of the expert wit-
nesses. Most of them were asked after the cross-examination
was finished, although some were asked prior thereto. It
clearly appears from the record that these questions were
asked for the purpose of bringing out material facts and dis-
closing the true situation. It was thus brought out that these
experts had formed their opinions from short interviews with
the appellant and his brother and from a reading of the Naval
medical reports, and that they had not talked with anyone
who had seen the appellant at or near the time the crimes were
committed. These witnesses had all testified to the effect that
the appellant was not in a settled state of insanity, that he
had a psychopathic personality with antisocial trends at times,

and that on occasions he may have lapsed into a "psychotic episode." Some of them thought there were two or three such episodes in his past life, basing this upon his statements to them and the medical records from the Navy. The effect of their testimony was that they were of the opinion that he had had another such episode at the time these crimes were committed. The reasons they gave for these opinions were unsatisfactory on their face. The questions asked by the court were directed to the facts underlying these reasons, and to whether or not an effort had been made to learn all material facts which were available. In no instance did the court express his own opinion. The effect of the questions asked, of which complaint is made, was unfavorable to the appellant only because of the admissions made in the answers thereto which disclosed the weakness of the reasons given for the opinions expressed.

After reading the entire record we are unable to view the questions thus asked as constituting either error or prejudice. This is particularly true in such a case as this where commission of the acts was conceded, and the sole question presented was whether or not the appellant was sane at the time. In the decision of that question the opinion of expert witnesses is important, but the weight to be given to such opinions depends on the reasons upon which they are based. To that end the full facts should be brought out, and it is not improper for the court to ask questions for that purpose when the evidence seems to indicate that important facts and considerations have been overlooked. The right to thus examine the alienists appointed by the court is expressly given by section 1027 of the Penal Code. The questions were not objected to at the time they were asked. Moreover, the court fully instructed the jury that he had not intended to express during the trial any opinion as to which witnesses were or were not worthy of belief, or what inferences should be drawn from their testimony; that if he had said or done anything which may have suggested that he was inclined to favor either party the jury was not to be influenced thereby; that in asking questions of certain witnesses his object had been merely to bring out in greater detail facts not fully covered; and that the jury was not to assume that because he had asked any questions of the witnesses he held any opinion as to the matters to which the questions related.

■ It is contended that the court committed prejudicial error in making the following statement to the jury:

"As I will instruct you later on, as I instruct you in every case in which experts testify, although they do testify the jury may disregard any testimony which any of them give, all the testimony any of them give, if you so desire. It is entirely up to you. You don't have to take into consideration their testimony. You may reject it. So it is entirely up to you whether you want to accept their testimony."

It is argued that the court thus indicated his belief that the appellant's witnesses should be disregarded, and also told the jury that, in considering expert testimony, it was to be guided by its own whim or desire rather than by the rule of reason. The remarks in question were a part of an explanation made by the court immediately prior to giving his instructions. In arguing to the jury counsel for the appellant had contended that some of the doctors, having been appointed by the court, were the court's witnesses rather than witnesses for the appellant, and had endeavored to create an impression that their testimony was entitled to greater weight because of that fact. Before beginning his instructions the court referred to this matter and explained that he had appointed two psychiatrists as required by law; that neither side had to call them; that each side might call them if it wished; that "Whoever calls them, it is that person's witness"; that in this case four doctors, including the two appointed by the court, were called by the defense, and another doctor by the prosecution; and that either side was free to call any psychiatrist it desired. The court then used the language first above quoted. The instructions followed and at the appropriate time the court, as the appellant admits, gave a correct instruction on expert testimony following the language of section 1127b of the Penal Code.

While the remarks complained of are not to be commended, and are in part erroneous, they were made for the purpose of correcting the impression left by an argument which had been improperly made. The remarks applied equally to all the expert testimony, and the jury was told that the real instruction on this subject would be given later, which was done. The oral recommendation made after the verdict was returned discloses that the jury did consider the expert testimony, and understood its real purport and effect. No reversible error appears.

■ It is argued that this was a close case as shown by the fact that the jury was out nearly eight hours, and that after

the verdict was read and the jury polled the foreman announced that ''The jury would like to recommend special consideration.'' These facts seem to be explained by the testimony of the doctors. While their testimony was vague and unsatisfactory they agreed that the appellant had an unfortunate personality and that he was not entirely normal in every respect. Several of them testified that he needed help and some form of treatment, but none knew just what treatment should be given, and two expressed doubt of the success of any treatment. On the motion for a new trial the affidavits of two jurors were presented in which they said that the jury intended to indicate their feeling that the appellant was ''in need of medical and psychiatric treatment.'' While the jury realized that the appellant was in need of treatment of some sort, it did not believe he was insane in the legal sense. While two of the doctors expressed the opinion that the appellant was insane at the time the acts were committed, and a third expressed the opinion that he was probably insane, the reasons they gave for those opinions were far from satisfactory and there was ample evidence to the contrary. Moreover, the doctors expressing that opinion testified that he was sane at the times they examined him and at the time of the trial, but thought he had had two or three psychotic periods in his past life and must have had such a period at the time in question. They had not seen or talked to anyone who had seen him near the time in question. Evidence of what he said and did at, before and shortly after that time strongly indicates that he then knew the difference between right and wrong and knew exactly what he was doing. The evidence amply supports the verdict, and when the entire record is considered the question of insanity, in a legal sense, does not appear to have been a close one.

Complaint is further made with respect to several other instructions given and refused, which were admittedly correct in themselves. Neither error nor prejudice appears and the matters are not sufficiently important to require amplification.

The judgment and order are affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied July 2, 1951, and appellant's petition for a hearing by the Supreme Court was denied July 19, 1951. Carter, J., and Schauer, J., voted for a hearing.