[Crim. No. 3910. Fourth Dist., Div. One. Sept. 30, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ELIAS GONZALES RUIZ, Defendant and Appellant.

---

---

## Counsel

Garza & Kassel and Donald W. Jordan, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Lawrence P. Scherb II, Deputy Attorney General, for Plaintiff and Respondent.

---

## Opinion

WHELAN, J.—Elias Gonzales Ruiz (defendant) appeals from a judgment imposing sentence for armed robbery (Pen. Code, § 211) and from an order denying his motion for a new trial.

The order denying the motion for new trial being nonappealable, the purported appeal therefrom is dismissed.

### Procedural Background

Defendant was first charged by complaint in the justice's court and at his arraignment therein was certified to the superior court upon a waiver of preliminary hearing. In the superior court proceedings were had to determine the question of his then sanity. At the hearing for that purpose Dr. Otto L. Gericke, medical superintendent of Patton State Hospital, and Dr. Ethel A. Chapman, assistant superintendent of psychiatric services at the same hospital, gave their respective opinions that defendant was then suffering from retrograde amnesia so as to be unable to cooperate with counsel in his own defense and on that basis was ruled insane within the meaning of Penal Code section 1368 and committed to Patton State Hospital where he remained until March 5, 1969, when he was returned to the superior court on the certificate of Dr. Gericke that he was sane.

Thereafter the first proceeding was dismissed, a new complaint filed in the justice's court, a preliminary hearing held, resulting in defendant's

being bound over for trial, and an arraignment had at which defendant pleaded not guilty by reason of insanity.

Defendant's contentions on appeal may be stated thus: (1) the entry of a single plea of not guilty by reason of insanity entailed the loss of the right of a trial by jury of a possible defense of diminished capacity and required that defendant be first informed of his right to such trial by jury of a possible defense and of the consequences of failing to plead not guilty with regard to such possible defense of diminished capacity; (2) it was error to fail to instruct the jury under Penal Code section 1127b; (3) trial counsel's failure to assert the defense of diminished capacity which defendant lost as a result of pleading only not guilty by reason of insanity and trial counsel's stipulating the jury need not be instructed under section 1127b demonstrate the incompetence of trial counsel which resulted in a denial to defendant of his Sixth Amendment right to be represented by counsel; and (4) the evidence showed as a matter of law that defendant was insane.

Our discussion of the contentions does not follow the same order as our statement of them.

### SUFFICIENCY OF THE EVIDENCE AS TO SANITY

Defendant presented the testimony of Drs. Gericke and Chapman, each of whom testified to an opinion defendant was insane at the time of the commission of the robbery. There was no opinion evidence to the contrary and no other testimony on behalf of defendant.

We discuss under another heading the bases for the opinions of the psychiatrists. They were not on the ground defendant suffered from retrograde amnesia as when the psychiatrists gave their opinions in the hearing under Penal Code section 1368.

As a part of the evidence bearing on the issue of sanity, the People introduced the testimony of Charles W. Kilgore (Kilgore) and Frank DeMoney (DeMoney) as to the circumstances of the robbery.

On April 28, 1968, at 2 or 2:30 p.m., defendant entered the Ace Liquor Store in El Centro, displayed a .22 caliber revolver, and said, "This is a holdup." Kilgore, owner of the business, was working at his desk near the front of the store, and his clerk (DeMoney) was standing behind the counter at the cash register.

Kilgore reached into a desk drawer where he kept a pistol and in the process pushed an alarm button. To Kilgore defendant acted "as normally as any other person in a holdup," although he was more nervous

than a few minutes before when he had entered, made a purchase of cigarettes and left, returning later with the gun. Defendant approached Kilgore, ordered him to stand, put the point of the gun at his back and made him walk to the cash register. Defendant told DeMoney to put the cash in a paper bag and after he had the money defendant picked up a .45 caliber pistol lying under the register. In an attempt to stall until the police arrived, Kilgore told defendant not to get emotional, that the store was insured. Defendant said that didn't matter since he was going to kill Kilgore anyway.

Defendant then ordered Kilgore and DeMoney to walk down an aisle toward the rear of the store. At that point the police arrived. Defendant told the police not to come closer or he would shoot Kilgore. The police left the store and defendant made the two men enter the restroom at the rear of the store and shut the door. Defendant then told Kilgore to let him into the restroom or he would kill him. Kilgore held the door closed while defendant tried several times to push it open with his shoulder. The next time defendant pushed the door, Kilgore released it and, as defendant entered off balance, Kilgore grabbed the gun and the two men went down to the floor. During the fight Kilgore took the gun from defendant and DeMoney hit defendant on the head several times with a small propane tank. The police then took defendant into custody.

DeMoney recognized the robber as a man who had been in the store three times the night before, twice to buy beer, the third time, when he was accompanied by a little boy, to buy .22 caliber cartridges.

The prosecution also presented the testimony of Dr. Marvin Royce, a surgeon, who testified he first observed defendant in the hospital on April 28 or 29, when defendant knew who he was, where he was and his approximate position in time; at that time Royce saw a depressed skull fracture about an inch in diameter in the left posterior parietal region which is just in front of and above the ear, which he again observed on April 30 during surgery, when the fragments of bone pointing toward the brain were removed and Royce saw the membrane covering the brain was intact and there was no damage to the brain itself; after the operation Dr. Royce could find no evidence of a memory defect and thought defendant was aware of the injuries he had sustained.

■ Defendant has contended on appeal that evidence as to the circumstances of the crime should not have been admitted since he did not deny the robbery, and that trial counsel should have objected to such evidence.

Obviously those circumstances were relevant to the question of defendant's mental state at the time. Defendant's psychiatric witnesses examined

the police reports in obtaining material upon which to form an opinion as to defendant's sanity.

In discussing a defendant's capacity to form a specific intent, the Supreme Court stated in *People* v. *Ford,* 60 Cal.2d 772, 793 [36 Cal.Rptr. 620, 388 P.2d 892]: "[T]estimony as to the circumstances of the robbery, believed by the jury, permits of no other interpretation than that defendant entertained a specific intent to steal when he demanded Roope's money at gunpoint. (*People* v. *Stone* (1963) *supra,* 213 Cal.App.2d 260, 264 [2] [28 Cal.Rptr. 522], and cases there cited.)"

■ Although the psychatric testimony was uncontradicted by any other psychiatrist, as in *People* v. *MacPherson,* 2 Cal.3d 109, 114 [84 Cal.Rptr. 129, 465 P.2d 17]; *People* v. *Ford,* 65 Cal.2d 41, 55 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Wolff,* 61 Cal.2d 795, 804 [40 Cal.Rptr. 271, 394 P.2d 959]; *In re Dennis,* 51 Cal.2d 666, 674 [335 P.2d 657], the jury might properly have disregarded it under proper instruction by the court. (Pen. Code, § 1127b; *People* v. *Coogler,* 71 Cal.2d 153, 169 [77 Cal.Rptr. 790, 454 P.2d 686].)

That is true particularly because of the disparity of the views expressed by both psychiatrists concerning defendant's mental defect at the hearing under Penal Code section 1368 and at the criminal trial; and because defendant had been certified as sane for the purpose of trial as having been cured of a mental defect (retrograde amnesia) quite different from the psychosis the doctors thought he suffered from at the time of the robbery.

### The Failure to Enter a Plea of Not Guilty

The record does not show that the trial court at the time of arraignment advised defendant of his right to plead not guilty.

■ When defendant was arraigned on April 29, 1969, and his plea of not guilty by reason of insanity was entered, his counsel was present. It is not incumbent upon the court to explain the effect of a plea when a defendant is represented by counsel, as was defendant. (*People* v. *Emigh,* 174 Cal.App.2d 392 [344 P.2d 85]; see also *People* v. *Martinez,* 154 Cal. App.2d 233, 236-237 [316 P.2d 14]; *People* v. *Langdon,* 52 Cal.2d 425, 432 [341 P.2d 303].)

We reject the suggestion that either the court or defense counsel believed a defense of diminished capacity could be urged under a plea of not guilty by reason of insanity.

It was for the defendant, after full consultation with counsel, to decide what plea to enter.[1] In advising his client in that respect defense counsel had to consider whether it would be best for defendant to stand upon a defense of insanity alone, or to weaken the effect of such a plea by arguing also for a second best defense of diminished capacity.[2]

As regards a defense of diminished mental capacity in the case at bench, we refer again to the quotation from *People* v. *Ford, supra,* 60 Cal.2d 772, 793, set out above.

## COMPETENCE OF TRIAL COUNSEL

■ It was a serious error of judgment for defense counsel to have stipulated that the instruction under Penal Code section 1127b need not be given. Whether he did so because at the time counsel as well as the court had been informed the jury had already reached a verdict, there is no way of knowing. If he had such information he could not have known what the verdict was and should not have given away an available weapon for attack upon a possible adverse verdict.

Had he not so stipulated he might have obtained a resubmission under a proper instruction, or an order declaring a mistrial.

However, the error in judgment was not such as to justify a finding of incompetence as defined in *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]. The same may be said with regard to the making of a single plea of not guilty by reason of insanity.

## FAILURE TO INSTRUCT UNDER PENAL CODE SECTION 1127b

■ One contention made by defendant merits serious attention, the claim of error in the failure to give the instruction provided for by Penal Code section 1127b, which reads in part as follows: "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows:

"Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall

---

[1] See tentative draft of proposed Standards Relating to the Prosecution Function and the Defense Function, pages 162-163 (ABA March 1970).

[2] At the time of oral argument defendant's appellate counsel said he had in one instance made the same choice as did trial counsel in the case at bench.

find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable."

Such an instruction had apparently been proposed by both parties but was overlooked until after the case had been submitted to the jury. During the course of the jury's deliberations the following occurred:

"BY THE COURT: Let the record show the defendant is present with his attorney and that Mr. Blume is representing the District Attorney's Office and the jurors are absent from the courtroom.

"It's been called to my attention that Instruction Number 56 CALJIC, which deals with expert testimony, should have been given in this case and there are cases, as I understand it, holding that it's not reversible error not to give it. Now, since the jury has gone out, will counsel stipulate or waive the giving of this instruction?

"BY MR. PATTIE: Yes, I will, Your Honor. I feel the basic elements of the instruction have been given in the Court's other instructions and I will, therefore, waive its reading for the record.

"BY THE COURT: All right. Let the record so show.

"BY MR. BLUME: Your Honor, may the record further show that the substance of that instruction would normally have been given in Instruction 801, but the paragraph dealing with expert opinion in Instruction 801 was crossed out at the request of the defense.

"BY MR. PATTIE: I will stipulate to that, Your Honor. This was done, of course, with the understanding that Instruction Number 56 from CALJIC would have been given.

"BY MR. BLUME: So the defense is waiving that entire instruction, both as contained in 801, which they have requested be removed, and they are waiving the instruction as in 56.

"BY MR. PATTIE: Not 801; not Instruction 801, but so given in Instruction Number 11. That's the one that was crossed out.

"BY THE COURT: We are asking waiving of 56.

"BY MR. PATTIE: Yes, I am waiving—I will waive 56 and I also previously requested the Court to omit it from Instruction Number 11.

"BY THE COURT: Yes.

"BY MR. BLUME: I believe that's correct.

"BY THE COURT: All right. Would you ask the bailiff to bring the jury in. I understand they have a verdict."

The instruction called for by section 1127b is that referred to in the quoted discussion as CALJIC 56 (Rev. ed. 1958). That referred to in the discussion as #11 had contained a paragraph that had been crossed out and not given, which read as follows: "Duly qualified experts may give their opinions on questions in controversy at a trial. To assist you in deciding such questions, you may consider the opinion with the reasons given for it, if any, by the expert who gives the opinion. You may also consider the qualifications and credibility of the expert. You are not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled. You may disregard any such opinion if you find it to be unreasonable."

It was error in the first instance to fail to give an instruction directed by statute to be given in a case where the evidence made the instruction proper.

Two questions arise: Was the error such as to compel reversal if the stipulation had not been entered into by defense counsel?

If the error was of such magnitude, was it invited error so that it may not be urged as a ground for reversal, or was it cured by the stipulation of counsel?

In passing upon those questions we accept as a fact that defendant personally was present during the quoted discussion as stated by the judge.[3]

We conclude the error was of such magnitude as to compel reversal despite the stipulation and the doctrine of invited error.

The only witnesses for the defense were Dr. Gericke and Dr. Chapman, both of whom were qualified physicians and surgeons in the field of psychiatry. The only defense was that of defendant's insanity at the time of the robbery.[4]

Both psychiatrists had been appointed by the court on April 29, 1969, under Penal Code section 1027. Presumably their opinions were known to both sides before the trial commenced.

---

[3]The clerk's minutes covering the matter also include the return of the jury's verdict which would hardly have been taken in defendant's absence.

[4]In *People* v. *Sorenson*, 231 Cal.App.2d 88, 93, 94 [41 Cal.Rptr. 657], the court said: "In the present case, the only medical evidence was that presented by the defense. Although not compelling, that evidence strongly tended to support a verdict of legal insanity. The prosecution might have produced contrary medical evidence (Pen. Code, § 1027), but did not do so. It sought only to weaken the defense medical evidence by cross-examination. The rebuttal evidence of the prosecution was meager enough. Two lay witnesses testified to defendant's seeming appearance of normality. . . . Whether the evidence was 'closely balanced' or gravitated in favor of the defense, there is a grave doubt as to defendant's sanity at the time of the offense and thus as to his guilt."

The fact they were so appointed did not add to the weight of their testimony. (See *People* v. *Grebe,* 105 Cal.App.2d 27, 34 [232 P.2d 564].)

Each of the two psychiatrists expressed the opinion defendant was insane in the legal sense at the time of the robbery.

Dr. Gericke was of the opinion defendant understood the nature of his act in robbing the store, but was unable to understand the consequences of the act and to distinguish between right and wrong.

Dr. Ethel Chapman too was of the opinion defendant was insane at the time of the robbery in that he was unable to distinguish clearly between right and wrong and to appreciate the nature and consequences of his .act.

Dr. Gericke first examined defendant on two occasions before he testified that defendant, in his opinion, was insane in the sense of being unable to cooperate with counsel because of retrograde amnesia. Dr. Chapman had testified at the same hearing, under Penal Code section 1368 et seq.

At the time of that first hearing, Dr. Gericke had the police report on the robbery, records of defendant from Harbor General Hospital, and psychiatric records from the Parole Out-patient Clinic of Los Angeles.

Dr. Gericke and Dr. Chapman again interviewed defendant on May 25, 1969, after reading the files of the district attorney containing police reports and transcript of the preliminary hearing, and a letter statement from Dr. Royce.

Dr. Gericke also discussed defendant's history with defendant's wife and brother.

Dr. Gericke's opinion was based in part upon the records of defendant's stay of nine months in Patton State Hospital, which included considerable psychiatric observation and a full battery of psychological tests with a diagnosis of manic depressive psychosis, depressed type; the opinion of the Patton State Hospital psychologists he was a suicidal risk and depressed to the point of being mentally ill; his medical history prior to that commitment, including the period of his stay in San Quentin when he received treatment in a "tremendous amount" for syphilis; the Wassermann test report which suggested a neurological condition; a letter from Dr. Smith, chief psychiatrist at San Quentin, with his diagnosis that defendant was a paranoid personality with dull average intelligence; history of an automobile accident in 1962 with a head injury for which he was hospitalized for approximately a month; a second automobile accident with another head injury in 1966 for which he was hospitalized for another month; subsequent treatment at Metropolitan State Hospital after he became addicted to the medication

that had been prescribed to relieve pain and sleeplessness; a history of three seizures epileptic in nature for which Dilantin had been prescribed following the head injuries; a brain wave test at Metropolitan State Hospital showing an abnormal brain wave, possibly resulting from the two head injuries and the arrested neuro-syphilis; the depression resulting from disability following the automobile accidents which caused him to go from the independence of a skilled workman to public assistance; and worry that his life-time parole from prison would be revoked because of two traffic tickets he had received.

Dr. Gericke thought that because of the seizures and the result of the encephalogram there must be some organic brain damage present.

Dr. Chapman's basis of opinion was much the same as that of Dr. Gericke. She brought out that the information from Harbor General Hospital that had been received when her first opinion was given in 1968 was only an abstract; that before forming the opinion as to which she now testified she and Dr. Gericke had the detailed clinical record from that hospital. She placed more emphasis on the organic brain damage with a psychosis of the psychogenic nature, and made specific mention of laboratory tests that indicated organic brain disease, which tests were a positive spinal fluid and a positive electroencephalogram.

Defendant could not have a fair trial on the issue of sanity where his only evidence was the testimony of psychiatrists uncontradicted by the testimony of another psychiatrist unless the jury were instructed as to the manner of treating such expert testimony.

The only case we have found dealing with the question where the sole issue was that of sanity was *People* v. *Grebe, supra,* 105 Cal.App.2d 27, where the instruction was given. Cases that have held it non-prejudicial to fail to give the instruction as to other classes of opinion evidence are not controlling. (See *People* v. *Morris,* 110 Cal.App.2d 469 [243 P.2d 66]; *People* v. *De Witt,* 98 Cal.App.2d 709 [220 P.2d 981]; *People* v. *Agajanian,* 97 Cal.App.2d 399 [218 P.2d 114]; *People* v. *Brac,* 73 Cal.App.2d 629 [167 P.2d 535]; *People* v. *Moore,* 70 Cal.App.2d 158 [160 P.2d 857]; *People* v. *Fellows,* 139 Cal.App. 337 [34 P.2d 177]; *People* v. *Sheridan,* 136 Cal.App. 675 [29 P.2d 464]; *People* v. *Williamson,* 134 Cal.App. 775 [26 P.2d 68]; *People* v. *Bowens,* 229 Cal.App.2d 590 [40 Cal.Rptr. 435].)

It might be argued that Penal Code section 1127b is intended only to protect a defendant from the effect of testimony by expert witnesses for the prosecution and that it permits the jury to depreciate such testimony when they would not do so without the instruction. *People* v. *Bowens, supra,* 229 Cal.App.2d 590, 599, contains this language: "It is well-settled that when

the prosecution relies upon expert testimony, it is the court's duty to instruct the jury that a duly qualified expert may give his opinion on a question in controversy; that in deciding such question the jury may consider the opinion with the reasons stated therefor; that the jury is not bound to accept the opinion of an expert as conclusive, but should give the opinion the weight to which the jury finds it is entitled; and that the jury may disregard such opinion if it finds it is unreasonable."

If that were true, which nothing in the language of the section indicates, the fact remains that the prosecution relied heavily upon the testimony of an expert, Dr. Royce of the Imperial County Hospital. Dr. Royce's opinion that defendant did not suffer from any memory defect whatever was given over objection from defendant, and his opinion was received that there was no damage to defendant's brain in such language that it might have been understood to mean there was no damage to any part of defendant's brain, although Dr. Royce could only have seen the membrane covering that part of the brain which might have been injured by the blow received in the robbery and which was exposed in the operation following the robbery.

Moreover, in argument to the jury the district attorney relied upon the opinions of Dr. Royce on those matters for the purpose of attacking the opinions of the two defense witnesses.

We express elsewhere our reasons for concluding that the jury might have found the defendant sane despite the opinions of the two psychiatrists.

But to do so the jury should first have viewed the psychiatric testimony in the light of a proper instruction as to the manner of considering such testimony.

In an attempt at understanding of the course followed by a possibly deranged mind, a right attitude and horse sense may be inadequate without even the Ptolemaic map of psychiatry as an aid.

Here the jury had retired to deliberate at 3:05 p.m. and returned into court with a verdict at 3:24 p.m., having apparently communicated earlier the fact that a verdict had been reached.

The opinions that had been expressed by the psychiatrists were not based upon hypothetical questions but in part upon the direct observations of the psychiatrists, upon clinical records and the reports of clinical testing, including some tests made in the hospital with which the doctors were associated. Some of the data were of a concrete nature, such as the history of neuro-syphilis, seizures, and of head injuries.

A fair consideration of the validity of the opinions expressed with relation to the reasons given therefor could hardly have been accomplished in

the full 19 minutes between submission of the case to the jury and the jury's return to the courtroom with a verdict.

We conclude that as a result of the failure to instruct upon the manner in which such testimony was to be viewed, a fair consideration of the testimony was not given. The presumption that the jury has followed the court's instructions does not apply as to a matter concerning which no instruction has been given.

The error was not one invited by counsel, who had in fact requested the instruction. The doctrine of invited error does not in every instance protect from successful attack a verdict arrived at as the result of such error. (*People* v. *Keelin,* 136 Cal.App.2d 860, 874-875 [289 P.2d 520, 56 A.L.R.2d 355]; *People* v. *Ray,* 252 Cal.App.2d 932, 963 [61 Cal.Rptr. 1].)

In the case at bench, no deliberate tactical purpose of defense counsel was expressed in his stipulation the instruction need not be given, so that the doctrine of invited error does not apply. (*People* v. *Graham,* 71 Cal.2d 303, 318-320 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Newton,* 8 Cal.App.3d 359, 380-381 [87 Cal.Rptr. 394].)

In *People* v. *Bowens, supra,* 229 Cal.App.2d 590, 600, it was held not reversible error to fail to give the same instruction where there was expert testimony that the defendant was a user of narcotics and was under their influence when arrested, for the purpose of showing he had knowledge of the narcotic. The court there declared the rule to be: "[T]he erroneous failure to instruct the jury regarding the weight of expert testimony is not prejudicial unless the reviewing court, upon an examination of the entire cause, determines that the jury might have rendered a different verdict had the omitted instruction been given. [Citations]"

In the circumstances the error was not cured by the stipulation of defense counsel that the instruction need not be given. So far as the record shows the omission was not brought up until the jury had given word that a verdict had been reached. No greater binding effect can be given to the stipulation because of the defendant's presence when it was made. Sane or insane, he could hardly have understood the meaning and effect of the stipulation.

Had the instruction been given at that late point in the proceedings, it may well have been too late to receive careful consideration from a jury that had already arrived at a verdict.

On his motion for new trial on the ground of newly discovered evidence, defense counsel presented the affidavit of Dr. Guy M. Hunt, a neurologist,

with attached X-rays. The affidavit was to the effect that after the trial that doctor had performed a pneumoencephalogram and stated the examination revealed some cerebral atrophy, including large portions of the frontal lobes which are the part of the brain important to cerebral functions.

There is nothing by affidavit to show why evidence to that effect could not have been produced at trial, although counsel made statements as to why it had not been done. For that reason, we find no abuse of discretion in the court's denial of the motion.

The judgment is reversed.

Brown (Gerald), P. J., and Ault, J., concurred.