[Crim. No. 26780. Second Dist., Div. Five. Nov. 19, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT WARREN ADAMS, Defendant and Appellant.

**COUNSEL**

Barry Tarlow, Robert C. Moest, Garza, Kassel & Jordan and Donald W. Jordan, Jr., for Defendant and Appellant.

Joseph P. Busch, District Attorney, Harry B. Sondheim and Donald J. Kaplan, Deputy District Attorneys, for Plaintiff and Respondent.

**OPINION**

**HASTINGS, J.**—Defendant Robert Warren Adams was convicted in the municipal court of violating Vehicle Code, section 23101, subdivision (a), and Penal Code, section 17, subdivision (b)(4) (injuring another person by driving an automobile while under the influence of intoxicating liquor). His conviction was affirmed by the appellate department of the superior court. This appeal is before us by order of this court filed April 14, 1974, wherein it was ordered that the cause be transferred to this court for hearing and decision pursuant to rule 62, subdivision (a), California Rules of Court.

STATEMENT OF THE CASE

Three witnesses testified that they saw defendant, or a male person answering his description, drive an automobile into and injure a pedestrian. Three other witnesses testified that the automobile was driven by defendant's wife.

Defendant, at the behest of his attorney, took a self-imposed polygraph test approximately 18 days after the accident, which was administered by Mr. Chris Gugas, an experienced polygraph examiner. Prior to commencement of trial by jury, defendant moved the court for an order admitting in evidence at trial, the testimony of Mr. Gugas on the results of said test, and requested an opportunity to first present evidence to lay a sufficient foundation to show that such evidence should be properly admitted. At that time defendant conceded that the only issue at the trial

itself would be whether he or his wife was driving the vehicle at the time it struck the pedestrian in a crosswalk.

The court held an evidentiary foundational hearing in advance of the trial and took extensive evidence from expert witnesses concerning the theory and practice of polygraph testing in general, and of the procedure used in this specific test. In a learned and detailed memorandum opinion, the court concluded that it was satisfied that the evidence produced at the foundational hearing was sufficient to prove that the *Frye*[1] test of general acceptance had been met with respect to polygraph evidence testimony. The court, however, excluded the polygraph evidence, primarily on the ground of stare decisis, stating that all California appellate court decisions to date had ruled that polygraph testimony was inadmissible.

## ISSUE

Defendant contends that the trial court erred in refusing to admit into evidence the proffered polygraph test results.

## DISCUSSION

It is undeniable that to date the great majority of appellate decisions in all jurisdictions have ruled polygraph evidence to be inadmissible. California opinions are with the majority. In 1957, in *People* v. *Carter,* 48 Cal.2d 737, on page 752 [312 P.2d 665], our California Supreme Court specifically stated that: "Lie detector tests do not as yet have enough reliability to justify the admission of expert testimony based on their results." (Citing *People* v. *Wochnick,* 98 Cal.App.2d 124, 126-128 [219 P.2d 70] and *People* v. *Porter,* 99 Cal.App.2d 506, 510-511 [222 P.2d 151].) In 1959, in *People* v. *Jones,* 52 Cal.2d 636 [343 P.2d 577], the court said on page 653: "The courts have consistently held that whether the test is a polygraph test, or a . . . sodium pentothal test, the results are not such as to be admissible for or against the defendant because of a lack of scientific certainty about the results." And in *People* v. *Thornton* (1974)

---

[1]The accepted modern standard for the admissibility in evidence of the results of novel scientific tests was spelled out in *Frye* v. *United States* (1923) 293 F.1013, where the court on page 1014 said: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained *general acceptance in the particular field in which it belongs.*" (Italics added.)

11 Cal.3d 738, 763-764 [114 Cal.Rptr. 467, 523 P.2d 267], the court states: "Defendant next contends that it was error for the trial court to exclude evidence to the effect that he had taken a polygraph test to prove his innocence. He realizes that the results of such a test are not admissible evidence in a court of law (see *People* v. *Jones* (1959) [*supra*], 52 Cal.2d 636, 653 [343 P.2d 577]) [fn. omitted], but he contends that evidence of his *willingness* to take such a test should be admissible as 'a badge of innocence.' We rejected a similar contention in *People* v. *Carter* (1957) [*supra*], 48 Cal.2d 737 [312 P.2d 665]. There a former suspect in the crime for which defendant was on trial made a statement that he, the suspect, had been willing to take a lie detector test in the matter. The statement was admitted into evidence, thereby raising 'the implication . . . that defendant had refused to take a lie detector test and that his refusal furnished some evidence of guilty knowledge.' (48 Cal.2d at p. 752.) We held that the admission of the statement was error, reasoning that because lie detector tests themselves are not considered reliable enough to have probative value, 'a suspect's willingness or unwillingness to take such a test is likewise without enough probative value to justify its admission. *The suspect may refuse to take the test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth. A guilty suspect, on the other hand, may be willing to hazard the test in the hope that it will erroneously record innocence, knowing that even if it does not the results cannot be used as evidence against him.*' (48 Cal.2d at p. 752.) This reasoning is applicable to the instant contention; the proffered evidence was properly excluded." (Italics added.)[2]

The predominant reason cited by the cases for denying its admissibility is that the polygraph has not yet met the criterion set forth in *Frye* v. *United States* (see fn. 1, *ante*).[3] *Frye* was decided in 1923 and unquestionably substantial progress has been made in improving the equipment and operator techniques used in administering the test. Accordingly, polygraphers, attorneys, psychologists and physiologists have mounted an energetic campaign[4] in our courts to obtain rulings that

---

[2]Also see *People* v. *Schiers,* 19 Cal.App.3d 102 [96 Cal.Rptr. 330] and *People* v. *Aragon,* 154 Cal.App.2d 646 [316 P.2d 370].

[3]In 1966, our Supreme Court, in *Huntingdon* v. *Crowley,* 64 Cal.2d 647, 653-654 [51 Cal.Rptr. 254, 414 P.2d 382], repeated the *Frye* statement and said: "This is also the rule in California." The court was concerned with the admission of medical testimony based on a system of blood grouping that was still in the experimental stage at the time it was offered.

[1]See Norman Ansley, editor, Legal Admissibility of the Polygraph (1975); and Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System* (1975) 26 Hastings L.J. 917.

the polygraph is now generally accepted under the *Frye* test. On the other hand, other professionals in the same fields adamantly argue that, although the polygraph has demonstrated its value in the investigative field, the results of its tests should not be admitted as evidence in a court trial. Recent decisions in other jurisdictions illustrate that the courts have been variously influenced by both sides of the argument. These decisions competently detail the pros and cons of the issue, with generous footnotes that identify the works of the experts in the field. To prevent duplication and a lengthy opinion, we cite and briefly report on some of these cases without repeating the voluminous data that will be of value to researchers interested in the problem.

In most federal courts, polygraph evidence remains inadmissible. The latest case, to our knowledge, summarizing the substantive reasons for refusing admittance is *United States* v. *Wilson* (D.Md. 1973) 361 F.Supp. 510. The court cites the *Frye* test but chooses not to base its decision solely on the issue of the "general acceptance" rule. Instead, it assesses the progress of polygraphy by drawing on contributions from those engaged both in its theory and practice and concludes, "even assuming relevance, the degree of which is speculative, the substantial prejudicial consequences compel denial of the motion" (to admit the evidence). (*Supra* at p. 514.)

However, in *United States* v. *Ridling* (E.D.Mich. 1972) 350 F.Supp. 90, 93, a perjury prosecution case, the court admitted polygraph evidence of a court-appointed polygrapher because "[a] perjury case is based on 'willfully' or 'knowingly' giving false evidence. The experts all agree that the polygraph examination is aimed exactly at this aspect of truth." And in *United States* v. *DeBetham* (S.D.Cal. 1972) 348 F.Supp. 1377, the court, after an exhaustive summary of both sides of the issue, stated that its conclusions might warrant admissibility, but denied admission primarily on the rule of stare decisis.[5]

The latest State jurisdictional case to come to our attention is *State* v. *Dorsey* (1975) 88 N.M. 184 [539 P.2d 204]. Here the court reversed a

[5]A federal district court, in *United States* v. *Zeiger* (D.D.C. 1972) 350 F.Supp. 685, determined that polygraph evidence was admissible. On appeal this decision was reversed. (See 475 F.2d 1280 [155 App.D.C. 11].)

In *United States* v. *Frogge* (5th Cir. 1973) 476 F.2d 969, the trial court's exclusion of polygraph evidence was affirmed, largely based upon existing precedent, but the court stated at page 970 that "a trend may be emerging towards loosening the restrictions on polygraph evidence."

criminal conviction that had held polygraph evidence to be inadmissible.[6]

## DISPOSITION

■ Based solely on the facts of the instant case and the state of the law in California on this issue, we therefore, for the reasons hereinafter stated, conclude that the results of the polygraph test administered to defendant should not have been admitted.

We disagree with the trial court that, except for the rule of stare decisis, the evidence here was admissible. Although failure to meet the "general acceptance" test spelled out in *Frye* is the primary reason given by the courts in denying admissibility of polygraph evidence, many experts on the subject believe the most important ground for denying admissibility has been the lack of proven reliability.[7] Andre A. Moenssens, author of chapter II of Legal Admissibility of the Polygraph, states on page 18: "[I]t is submitted that *general acceptance,* is not a proper test for admissibility. The eminent authority on evidence, Professor McCormick, suggests that 'General scientific acceptance is a proper condition upon the courts taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence.' Furthermore, *general acceptance* is not necessarily a proper test since it does not invariably equate with reliability. A better test for admissibility of novel scientific test results should require proof of reliability. *General acceptance* in a scientific community may, to some extent, be circumstantial evidence of reliability, but it should by no means be considered sufficient in itself." Our Supreme Court is probably in accord. While acknowledging the standard established in *Frye,* it recognized in *People* v. *Carter, supra,* 48 Cal.2d 737, 752, the importance of reliability.

It is our opinion that the foundational evidence on defendant's polygraph test did not establish a degree of reliability sufficient to warrant admissibility. Defendant, 18 days after the accident, took a unilateral test from a polygrapher of his own choosing. We believe this

---

[6]Noteworthy cases against admissibility are *Commonwealth* v. *A Juvenile (No. 1)* (1974) — Mass. — [313 N.E.2d 120] and *Commonwealth* v. *Fatalo* (1963) 346 Mass. 266 [191 N.E.2d 479].

[7]See Legal Admissibility of the Polygraph, *supra,* page 14; and Lykken, *Guilty-Knowledge Test. The Right Way to Use a Lie Detector* (March 1975) Psychology Today, pages 56-60. The majority of these experts, however, contend this evidence can now be reliable if the test is performed by a qualified polygrapher and meets certain standardized requirements.

seriously diminished the reliability of the test and rendered inadmissible the evidence it was designed to produce. In chapter IX of Legal Admissibility of the Polygraph, *supra,* written by Martin T. Orne, Ph.D., Harvard University, Professor, Department of Psychiatry, University of Pennsylvania,[8] subtitled "The Friendly Polygrapher," we find the following comments at pages 114-116:

"Recently a series of attempts have been made to introduce polygraph evidence in courts of law as the basis for corroborating a defendant's assertion of innocence. These cases all share an important feature: they involve a polygraph test administered by a polygraph examiner at the behest of the defense attorney. . . the very situation in which such tests are given in fact tends to violate some of the most important aspects of the situation which makes polygraph tests work.

"Whereas the usual polygraph examination is carried out in a situation where the polygrapher is at arm's length—in the employ of a law enforcement agency, a potential (or actual) employer or in some similar relationship, where his decision will inevitably have a direct effect on a suspect's future—the context in which the friendly polygrapher carries out his test is inevitably different.[9] In the latter case the suspect realizes that his attorney has employed the polygraph examiner to help in the preparation of his defense. For the innocent person this may matter relatively little; however, for the guilty individual it alters the situation considerably. The guilty individual when tested by a friendly poly-grapher knows that the results of the test *if he is found deceptive* will not be used against him. The only kind of findings which his attorney will utilize are ones where his innocence is being corroborated by the polygraph. As a consequence, the client's fears about being detected are greatly reduced. As we have been able to show in the laboratory, and as is acknowledged by all polygraph experts, a suspect's fear of detection is the major factor in assuring his augmented physiological response while

---

[8]Mr. Orne, in a preface to his article, states: "The substantive research reported herein was supported in part by the Institute for Experimental Psychiatry. I would like to express my appreciation to my colleagues in the Unit for Experimental Psychiatry, Mary R. Cook, Frederick J. Evans, Charles Graham, Emily C. Orne, David A. Paskewitz, and Harvey D. Cohen for their helpful comments and suggestions in the preparation of this manuscript. I am particularly grateful to Mr. John E. Reid for his detailed critical comments."

[9]Interestingly, in the case at bar, Mr. Gugas, when asked if he taped defendant's polygraph test, answered: "I don't use it in all cases because most of our cases are not court cases. . . . I didn't know that it (the polygraph test) was going to be used in court. If I had known this, I probably would have tape recorded it, *if I had the permission of the attorney and the subject.*" (Italics added.)

lying. It is precisely this aspect of the situation which is most dramatically altered when the polygraph is employed by the defendant's attorney. The respect and perhaps even deference accorded to the client by the polygraph examiner will tend to convince the client that the polygraph is really attempting to help his cause and thereby make him less afraid and less detectible, even if he is guilty. . . .

"It should be emphasized that these difficulties will tend to distort the results of the polygraph examination even with an extremely competent and highly experienced examiner who is genuinely trying his best to make an honest evaluation of an individual's truthfulness. . . .

"It would seem to the best interest of polygraph examiners in general to avoid permitting themselves to be used in the friendly polygrapher situation. For the reasons outlined above, their findings are inevitably less likely to be valid; further, since only data supporting the innocence of a client would ever be introduced, the respectability of the polygraph procedure would in the long run be diminished, especially as instances of its inaccuracy under these circumstances come to the attention of the public."[10]

These comments are very relevant when considered with the statement of our Supreme Court in *People* v. *Carter, supra,* 48 Cal.2d 737, 752, and reaffirmed in *People* v. *Thornton, supra,* 11 Cal.3d 738, 764; namely: " 'A guilty suspect . . . may be willing to hazard the test in the hope that it will erroneously record innocence, knowing that even if it does not the results cannot be used as evidence against him.' " In *Carter* and *Thornton,* we concede that the issue was different because the defendant wanted in evidence his statement that he offered to take a polygraph test, knowing

[10] William T. Vickers, senior polygraph examiner in the Los Angeles Sheriff's Department, testified on behalf of defendant. He stated that fear of detection is an important factor in obtaining results and the reliability of the test would be affected if the examinee realized the test would not be used against him.

Henry S. Dogin, deputy assistant attorney general, in his statement on polygraphs before the Foreign Operations and Governments Information Subcommittee, United States House of Representatives, said there are a number of substantial strong reasons to prevent the admission in evidence of *defense-given* polygraph examinations because, among others,: (1) subject's concern at being detected is the most important factor to the physiological indications of deception and if he knows adverse results will not go past his lawyers the test is not conducive to creating the requisite degree of concern. (2) No study has ever been undertaken to attempt to assess polygraph accuracy in these circumstances. (3) Absent videotaping, a prosecution is severely inhibited in cross-examining defense polygraphers about the multitude of factors which may have influenced the examinations and affected their conclusions. (4) There are no controls to prevent polygrapher "shopping," thereby permitting repeated examinations by different examiners until a defendant "passes" a test.

that it would be inadmissible. However, the analogy is clear. Nor is the problem solved when the test has erroneously recorded his innocence, by his subsequent agreement to take another test from an independent expert appointed by the court. Foundational testimony in the case at bar revealed that the more times a person is tested, the less reliable are the test results.[11]

We believe, for the reasons stated, that the result of the unilateral test administered to defendant was inadmissible and also would have so diminished the reliability of any future independent tests that they should not have been considered.[12]

Furthermore, other factors affected the reliability of defendant's test. At the foundational hearing, expert witnesses testified that numerous factors can adversely affect the reliability of a polygraph test, including emotional upset of the subject, his fatigue, *drunkenness, subjection to drugs,* bad physical or emotional condition, high blood pressure, hardening of the arteries, obesity, feeblemindedness, amnesia, psychotic condition, being a pathological liar, having lack of fear or lack of concern of being caught in a lie, surreptitious nervous stimulation, use of anti-perspirant, hypnosis or the presence of extraneous noise or abnormal temperature at the test locale.

In light of this testimony, the following circumstances are significant.

Evidence produced by the defendant showed that during a period of several hours preceding the accident, he had consumed from five to eight alcoholic drinks plus a half or full pint of whiskey shared with a friend, and that defendant took Valium pills "so he would have a higher high." After the accident a blood test showed defendant's blood alcohol content to be .21 percent. Defendant testified that he was drunk and asleep at the time of the accident. The record thus raises serious doubts whether defendant could have the requisite mental recall to generate meaningful

---

[11]The court asked Sergeant Vickers: ". . . do you have any opinion as to whether or not the reliability would be increased if the other side were also permitted to conduct a similar examination and introduce similar testing?" Answer: "I frankly think that with more testing, the less reliable you become in the testing." The Court: "You become, in effect, immune to it so you don't get any reaction; is that what you are saying?" Answer: "That's it." (Also see Henry S. Dogin, fn. 10 *ante*, on "shopping" until a test is passed.)

[12]Defendant at trial offered, along with his wife, to take a test from a court-appointed polygrapher. It is interesting to note that his wife was given a unilateral polygraph test by Mr. Dick Hickman, the result of which was stated to be "inconclusive."

responses in a polygraph test concerning his conduct when so affected by alcohol and drugs.[13]

Defendant admitted ingesting a tranquilizer drug some hours prior to his polygraph test. All experts agree that the polygrapher must carefully watch for signs of drug usage by the subject because such use might preclude a reliable examination. No satisfactory explanation was given of why appellant took the tranquilizer.

Defendant is a California licensed medical doctor. Sergeant Vickers was asked by the court if an M.D., because of his specialized knowledge of physiology, would have an increased ability to "beat the test." He answered, "if he was consciously trying, he possibly would have a better chance than the average citizen." He then stated a reliable operator could obtain a reliable reading, but "[i]t would be more difficult, much more difficult."

While we, for the above reasons, unlike the trial court, would not have admitted defendant's polygraph evidence, we agree it reached the right result based on the rule of stare decisis. ■ California decisional law outlined in our Discussion, *ante,* demonstrates that our Supreme Court, as late as the *Thornton* case in 1974, has determined polygraph evidence (except when admission is stipulated to by all parties) is inadmissible. The stare decisis doctrine requires the trial court and us to follow the holdings of the Supreme Court, absent such factual changes as to negate their applicability.

The judgment (order granting probation) is affirmed.

Stephens, Acting P. J., and Loring, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 11, 1976.

---

[13]The court asked Sergeant Vickers several questions directly in point. We repeat the principal questions and answers. The Court: ". . . Do you have an opinion as to whether a polygraph would be sufficiently reliable in that type of a case?" Answer: "There are a number of factors that would enter into it. I would like to know what his degree of intoxication was at the time it happened." The Court: "Well, let's make an assumption that a blood test was made of this defendant, and it resulted in a .21 percent blood alcohol . . . Does that give you the extra information you need, or would you need something else?" Answer: "No, that's enough. I frankly would rather not see that type of test used in court."

*Assigned by the Chairman of the Judicial Council.