[Crim. No. 8499. Third Dist. Dec. 23, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH MIRLYN REEDER, Defendant and Appellant.

236

**COUNSEL**

Kenneth Mirlyn Reeder, in pro. per., and Stuart W. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall and John W. Spittler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PUGLIA, P. J.**—Defendant appeals from the judgment entered after a jury convicted him of oral sex perversion (Pen. Code, § 288a) and forcible rape (Pen. Code, § 261, subd. 3).

On the evening of May 29, 1975, Cheryl S. was hitchhiking and accepted defendant's offer of a ride from Grass Valley to her home in Foresthill. Shortly thereafter defendant stopped the car at the side of the road, explaining to Miss S. that he had to go to the bathroom. Defendant left the car and returned a short while later. He told Miss S. he was going to make love to her. She pulled out a pocketknife and attempted to flee. Defendant announced he had a gun and ordered her to throw down the knife. She complied, and defendant forced her into the back seat of the car where he raped her and forced her to commit oral copulation upon him. After the attack, defendant transported her to a point near her home and let her out of the car. Miss S. reported the incident to police that same night. She was examined by a physician shortly thereafter.

At trial, defendant admitted giving Miss S. a ride but denied sexually attacking her. Aside from polygraph evidence, which will be discussed below, other prosecution evidence introduced to corroborate the victim's testimony was inconclusive. There were seminal stains on the rear seat of defendant's car, but defendant had owned the car only three weeks and the stains would be detectable for longer than that. Evidence established that there were seminal stains on the victim's pants, but the medical examination performed upon her shortly after the attack revealed no sperm in the vaginal cavity. The latter finding was inexplicably at odds with the victim's testimony.

The trial was thus reduced to a contest of credibility between the victim and the defendant, a contest the outcome of which was virtually foreordained by the strategy employed by defendant and his attorney. Prior to trial, defendant's attorney stipulated in writing with the district attorney that defendant and the victim each be administered a polygraph test by a licensed examiner, and that the details and results of the tests together with the opinions of the examiners be received in evidence. The

stipulation was signed by defendant and his attorney and by the victim and the prosecutor. Thereafter defendant and the victim submitted to separate polygraph tests administered by different examiners from the California Department of Justice. At trial, both examiners testified as expert witnesses for the People. Defendant's examiner offered his opinion that defendant was untruthful when, during the examination, he denied the acts constituting the charged offenses. The victim's examiner gave his opinion that her test responses to relevant questions about the charged offenses were truthful.

The jury was faced with the task of deciding which of the two antagonists was telling the truth without benefit of any evidence extraneous to their testimony pointing unambiguously in one direction or the other. Confronted with this quandary the polygraph must have appeared as *deus ex machina.* Under the circumstances, it is not at all surprising that the jury came down on the side of the victim.

██ It has long been established that submission to a polygraph test by a qualified examiner and admission in evidence of the results are proper subjects for stipulation (*Robinson* v. *Wilson* (1974) 44 Cal.App.3d 92, 103 [118 Cal.Rptr. 569]; *People* v. *Davis* (1969) 270 Cal.App.2d 841, 844 [76 Cal.Rptr. 242]; *People* v. *Houser* (1948) 85 Cal.App.2d 686, 694-695 [193 P.2d 937]) even though such evidence is not otherwise admissible (*People* v. *Adams* (1975) 53 Cal.App.3d 109, 119 [125 Cal.Rptr. 518]). Furthermore, there is no question in this case of trial counsel's express authority so to stipulate. ██ When authorized by his client, an attorney has the power to stipulate relative to any of the steps in a trial. (*People* v. *Dugas* (1966) 242 Cal.App.2d 244, 252 [51 Cal.Rptr. 478]; *People* v. *Wilson* (1947) 78 Cal.App.2d 108, 120 [177 P.2d 567].) Moreover, a stipulation not contrary to law, court rule or public policy is binding upon the court (*Bechtel Corp.* v. *Superior Court* (1973) 33 Cal.App.3d 405, 412 [109 Cal.Rptr. 138]).

██ Understandably stimulated and encouraged by the court's first opinion in this case (see *People* v. *Reeder* (Cal.App. 1976) [rehg. granted and opn. vacated May 24, 1976]), defendant urges·that the stipulation conclusively evidences incompetence of counsel. We need not decide the circumstances, if any, under which it could be said that such a stipulation is equivalent to incompetence because, under the facts presented by this record, that issue is an abstraction. By signing the stipulation, defendant put his personal imprimatur upon it. Beyond that, the idea to submit to a polygraph test originated with the defendant and was suggested by him

to his attorney. From that point on, the record does not disclose exactly what role counsel played in the episode. However, it is no more likely that defendant's polygraph suggestion was seconded uncritically by counsel as it is that defendant spurned counsel's advice and insisted upon proceeding contrary thereto. Whatever his position concerning the wisdom of the polygraph test, we shall not speculate in derogation of the judgment that counsel did not fully appreciate the risks involved and advise his client accordingly.

It would be anomalous indeed if defendant, who can waive assistance of counsel altogether (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]), could not indulge his own predelictions as to proceedings ordinarily within the province of counsel, even in the face of counsel's disagreement with his course. Certainly there is nothing in the Constitution to prevent an accused from following the guidance of his own wisdom and not that of a lawyer. (*Adams* v. *United States* (1942) 317 U.S. 269, 275 [87 L.Ed. 268, 273, 63 S.Ct. 236, 143 A.L.R. 435].) The values served by indulging defendant in a waiver of a fundamental right may in fact be of equal dignity with those protected by the right itself. This principle was eloquently articulated by the United States Supreme Court in a case concerned with a defendant's waiver of trial by jury. "When the administration of the criminal law is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of those safeguards . . . is to imprison a man in his privileges and call it the Constitution." (*Adams* v. *United States, supra,* 317 U.S. at p. 280 [87 L.Ed. at p. 275].) The principle is no less viable merely because its application does not advance the personal interests of the defendant. "[W]here the accused is harming himself by insisting on conducting his own defense, respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires and if he makes the choice 'with eyes open.' " (*United States* v. *Denno* (2d Cir. 1965) 348 F.2d 12, 15.) Thus, even though a defendant's tactical initiatives are ill-advised and destined to redound to his own detriment, his choices "must be honored out of 'that respect for the individual which is the lifeblood of the law.' [Citation.]" (*Faretta* v. *California, supra,* 422 U.S. at p. 834 [45 L.Ed.2d at p. 581].)

On the record before us we cannot assume that defendant did not accede to the stipulation freely and intelligently and with his eyes wide open. Defendant is no less bound by it merely because what might have

been a winning stratagem turned out to be a foolhardy gambit. For the reasons stated, we reject defendant's claim of incompetence of counsel.

■ Defendant contends that the trial court was required to instruct that the polygraph evidence was not to be considered upon the elements of the charged offenses, but only as it tended to prove or disprove the veracity of the subject at the time of the test. We disagree. Neither examiner claimed any evidentiary significance for the tests beyond the limits that defendant would impose by his suggested instruction. Accordingly, the trial court had no duty so to instruct *sua sponte*.

■ The trial court did err in omitting to instruct on the weight and effect of expert testimony. Penal Code section 1127b provides: "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. [¶] No further instruction on the subject of opinion evidence need be given." (See CALJIC No. 2.80.)

The instruction called for by Penal Code section 1127b must be given *sua sponte* where expert testimony has been received. (*People* v. *Bowens* (1964) 229 Cal.App.2d 590, 600 [40 Cal.Rptr. 435], overruled on other grounds in *People* v. *Mayberry* (1975) 15 Cal.3d 143, 158 [125 Cal.Rptr. 745, 542 P.2d 1337].) ■ However, the erroneous failure to instruct on the weight of expert testimony is not prejudicial unless the reviewing court, upon an examination of the entire cause, determines that the jury might have rendered a different verdict had the omitted instruction been given. (*People* v. *Lynch* (1971) 14 Cal.App.3d 602, 610 [92 Cal.Rptr. 411].)

■ Defendant's credibility relative to that of the victim was the pivotal issue at trial. The jurors were instructed generally that they had the exclusive duty to determine the effect and value of the evidence (CALJIC No. 1.00) and the credibility of the witnesses. (CALJIC No. 2.20.) They were not advised that they were "not bound to accept the opinion of any expert as conclusive" or that they "may . . . disregard any such opinion, if it shall be found by them to be unreasonable." (Pen. Code, § 1127b.)

It is impossible to assign a relative value even roughly equivalent to the impact upon the jury of the testimony of a particular witness. Theoretically the jury, rejecting defendant's testimony, could have accepted the testimony of the victim and that of either, both or neither of the experts. When alternative evidentiary formulations support the same result, credibility determinations obviously cannot be distilled from the record. They remain secreted in the minds of the jurors to whom such determinations are exclusively confided. Even so, it is totally unrealistic to assume, merely because the contrary cannot be demonstrated, that the uncontradicted testimony of the polygraph experts played no significant role in the ultimate decision of the jury. "[S]cientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, ..." (*United States* v. *Addison* (D.C.Cir. 1974) 498 F.2d 741, 744 [162 App.D.C. 199]; *People* v. *Kelly* (1976) 17 Cal.3d 24, 32 [130 Cal.Rptr. 144, 549 P.2d 1240].) Characteristically, the expert testimony herein tended to enshroud the practice of polygraphy in an aura of infallibility. The expert testimony claimed nothing less for polygraph testing than the ability to penetrate the inner-most recesses of the human personality and read the soul.

The experts testified to the functioning and operation of the polygraph generally and as particularly related to the examinations of defendant and the victim. The burden of their testimony as to the general capability of polygraph testing is succinctly summed up in the response of one of the experts. "I feel the only way to actually beat an examination is not to take it. The only exception, of course, if you have an examiner who isn't competent and is improper [*sic*] trained. Of course you can beat the examiner." Both examiners testified to extensive training and experience with the polygraph. Their qualifications were not questioned or challenged nor does it appear that they successfully could have been.

If, as seems inevitable to us, the polygraph testimony materially influenced the jury, then resolution of the credibility issue as between defendant and victim, in practical effect the ultimate issue in the case, was in significant part determined by the jury's evaluation of the expert testimony. At this point it bears repeating that polygraph evidence is considered by the great weight of authority to be so unreliable as to be inadmissible without a stipulation. (*People* v. *Adams, supra,* 53 Cal.App.3d at pp. 112-114.) If judicial skepticism is well-founded, the claims of the experts herein are no less extravagant because they are uncontroverted. Undoubtedly, the jury may still give full credit to such testimony where, as here, it is properly before them by stipulation of the

parties. If it is to do so, however, it should be with full awareness of its prerogative to discount or disregard even uncontradicted expert opinion if found to be unreasonable. Without that awareness, the critical, skeptical approach necessary to meaningful jury analysis of this questionable yet highly persuasive evidence will be foreclosed. In that event, the danger exists that the sovereign responsibility of the jury may in effect be subordinated to a misplaced faith in "scientific proof." A polygraph cannot serve as proxy for defendant's peers.

We therefore are of the view that it is reasonably probable that a result more favorable to defendant would have occurred had the instruction required by Penal Code section 1127b been given. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Lynch, supra,* 14 Cal.App.3d at p. 610; cf. *People* v. *Ruiz* (1970) 11 Cal.App.3d 852, 859-860 [90 Cal.Rptr. 110].)

We advert to one more point for guidance of the court and counsel on retrial. Although no objection was made by the defense attorney at trial, the jury was instructed and permitted to return a verdict on the theory that the charge of oral sex perversion had been committed with force and violence. The evidence supported the instruction and the verdict, but the information did not charge the use of force and violence as required by Penal Code section 288a as it read at the time of the offense.[1] (See Pen. Code, § 1009; *People* v. *Walker* (1947) 82 Cal.App.2d 196, 198 [185 P.2d 842]; *People* v. *Clawson* (1927) 82 Cal.App. 422, 424 [255 P. 552].)

The judgment is reversed.

Regan, J., concurred.

**FRIEDMAN, J.**—I concur. The court's opinion cogently demonstrates the significance of the missing jury instruction. Significance is not enough; the error must be prejudicial in the sense that it caused a miscarriage of justice. (Cal. Const., art. VI, § 13.) In appraising prejudice, reviewing judges habitually turn to the test announced in *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]—the judgment should be

---

[1]According to uncontroverted evidence, the violation of section 288a, if committed, was accomplished by force and violence. Therefore, defendant has no standing to attack the constitutionality of former Penal Code section 288a as it applies to consenting adults (*People* v. *Parker* (1973) 33 Cal.App.3d 842, 848-850 [109 Cal.Rptr. 354]). For the same reason, defendant does not benefit by the amendment of section 288a subsequent to the alleged offense (Stats. 1975, ch. 71, § 10, p. 134; Stats. 1975, ch. 877, § 2, p. 1958; cf. *People* v. *Rossi* (1976) 18 Cal.3d 295 [134 Cal.Rptr. 64, 555 P.2d 1313]).

reversed only if, after reviewing the entire record, the court finds a "reasonable probability" of a defense verdict had the error not occurred.

Here the evidence was characterized by sharp conflict. I have examined the record and find no reasonable probability of an acquittal absent the error. I find nothing but a toss-up. There was no cross-examination or rebuttal vitiating the polygraph experts' high opinion of their own technique. Standing alone, the omitted instruction would have done little to deprecate the two experts. Applying the *Watson* test as the sole criterion of prejudice, I would vote to affirm the conviction despite the error.

The purity of the *Watson* test has been alloyed by later emendations. Appellate judges are no longer safe to follow *Watson* as the sole standard of reversibility. The Supreme Court has approved a formula which it terms a "corollary" of the *Watson* rule although it is really a marked divergence. The formula is expressed as follows: "Where the evidence, though sufficient to sustain the verdict, is extremely close, 'any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial.' " (*People* v. *Gonzales,* 66 Cal.2d 482, 493-494 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Briggs,* 58 Cal.2d 385, 407 [24 Cal.Rptr. 417, 374 P.2d 257].)

Not in obedience to *People* v. *Watson,* but in deference to the *Gonzales-Briggs* formula, I conclude that the error requires reversal.