[Civ. No. 64290. Second Dist., Div. Two. June 23, 1982.]

GARY WITHERSPOON, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Edwin S. Saul and William S. Schneider for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, District Attorney, Harry B. Sondheim, R. Dan Murphy and Donald J. Kaplan, Deputy District Attorneys, for Real Party in Interest.

OPINION

**COMPTON, Acting P. J.**—Proceedings in mandamus to compel the Superior Court of Los Angeles County to hold a pretrial evidentiary hearing as a prelude to admitting certain evidence in a criminal trial. We grant the petition.

Gary Witherspoon (defendant) is awaiting trial on an information filed in Superior Court of Los Angeles County in which he is charged with eight counts of armed robbery.

In a properly noticed motion pursuant to Evidence Code section 402, he requested a pretrial determination of the admissibility of a confession alleged to have been made by him. In connection with that motion he sought an evidentiary hearing at which he proposed to prove the validity and hence the admissibility of a polygraph examination administered to him on the issues of the voluntariness of the confession and his innocence of the charges.

The trial court denied the motion and refused to hold an evidentiary hearing on the grounds that the results of the polygraph examination would be inadmissible regardless of what evidence the defendant might offer concerning such examination.

The trial court's decision was understandably the result of an unbroken line of appellate decisions in California restating a blanket exclusion of such evidence, absent a stipulation by the parties to permit its introduction. In short, the trial court's ruling was not an exercise of discretion but was simply a statement that it lacked any discretion in the matter.

Defendant petitioned this court for a writ of mandate to compel the trial court to conduct the evidentiary hearing. We denied the petition. The Supreme Court, however, granted a hearing and transferred the matter to our calendar.

■ After extensive review of the statute and case law along with defendant's offer of proof, we have concluded that the writ should issue to compel the holding of an evidentiary hearing. Of course the holding of an evidentiary hearing would be an idle act if the heretofore arbitrary and blanket exclusion of such evidence is to continue. Thus we have further concluded that upon a proper showing pursuant to the procedure

outlined in Evidence Code sections 402 through 406[1] and consistent with the trial court's valid exercise of discretion, as provided for by Evidence Code section 352,[2] no legal reason exists for continuing to apply the judicially developed exclusion of such evidence.

[1]*Evidence Code section 402 provides:* "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests. (c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

Evidence Code section 403 provides: "(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: (1) The relevance of the proffered evidence depends on the existence of the preliminary fact; (2) The preliminary fact is the personal knowledge of a witness concerning the subject matter of his testimony; (3) The preliminary fact is the authenticity of a writing; or (4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself. (b) Subject to Section 702, the court may admit conditionally the proffered evidence under this section, subject to evidence of the preliminary fact being supplied later in the course of the trial. (c) If the court admits the proffered evidence under this section, the court: (1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist. (2) Shall instruct the jury to disregard the proffered evidence if the court subsequently determines that a jury could not reasonably find that the preliminary fact exists."

Evidence Code section 404 provides: "Whenever the proffered evidence is claimed to be privileged under Section 940, the person claiming the privilege has the burden of showing that the proffered evidence might tend to incriminate him; and the proffered evidence is inadmissible unless it clearly appears to the court that the proffered evidence cannot possibly have a tendency to incriminate the person claiming the privilege."

Evidence Code section 405 provides: "With respect to preliminary fact determinations not governed by Section 403 or 404: (a) When the existence of a preliminary fact is disputed, the court shall indicate which party has the burden of producing evidence and the burden of proof on the issue as implied by the rule of law under which the question arises. The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises. (b) If a preliminary fact is also a fact in issue in the action: (1) The jury shall not be informed of the court's determination as to the existence or nonexistence of the preliminary fact. (2) If the proffered evidence is admitted, the jury shall not be instructed to disregard the evidence if its determination of the fact differs from the court's determination of the preliminary fact."

Evidence Code section 406 provides: "This article does not limit the right of a party to introduce before the trier of fact evidence relevant to weight or credibility."

[2]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The present rule in California appears to be based on the principle enunciated in *Frye* v. *United States* (D.C.Cir. 1923) 293 F. 1013, that the evidentiary use of scientific tests depends on the test's general acceptance in the particular field in which it belongs. *Frye* was decided in 1923.

The myriad of cases following *Frye*, which have, in one way or another, addressed the question have generally grounded their exclusion of the evidence on *ipse dixit* statements that the "reliability of the results of a polygraph examination has not been established" and that "courts in all jurisdictions have consistently denied their admission into evidence." (*People* v. *Wochnick* (1950) 98 Cal.App.2d 124 [219 P.2d 70]; *People* v. *Adams* (1960) 182 Cal.App.2d 27 [5 Cal.Rptr. 795]; *People* v. *York* (1959) 174 Cal.App.2d 305 [344 P.2d 811]; *People* v. *Parrella* (1958) 158 Cal.App.2d 140 [322 P.2d 83].)

In *People* v. *Carter*, 48 Cal.2d 737 [312 P.2d 665], decided in 1957, the California Supreme Court declared at page 752 "[polygraph examinations] do not as yet have enough reliability to justify the admission of expert testimony based on their results."

In *People* v. *Jones*, 52 Cal.2d 636 [343 P.2d 577], decided in 1959, the court again stated at page 653 "The courts have consistently held that ... the results [of a polygraph test] are not such as to be admissible for or against the defendant because of a lack of scientific certainty about the results."

In none of the foregoing Court of Appeal and Supreme Court opinions is there any detailed discussion of the basis for such statements. In none of these cases does it appear that any evidence was offered on the subject. This is probably explained by the fact, as evidenced by the case at bench, that in face of the widely accepted rule of inadmissibility any offer of proof on the subject would have been a futile gesture.

On the other hand it was observed in 39 Cal.L.Rev. 439, *Status of Lie Detector Evidence in California* (1951) at p. 441: "Despite the near unanimity of exclusion of lie detector evidence, close examination demonstrates that most courts have refrained from laying down a hard and fast rule against admissibility. Rather, they have rested their holdings on failure of the proponent to demonstrate that the lie detector has such a scientific standing that it would be error for the trial court to refuse the proffered evidence."

The case law, while commendably consistent in applying the doctrine of stare decisis, has failed satisfactorily to identify in just what "scientific field" the necessary "acceptance" must be achieved, a failure which suggests a lack of understanding of the polygraph examination which at present time is widely accepted for use in many areas of our government and society.

In our opinion, the more serious defect in the later cases which have, with an almost "knee jerk" response, continued some 60 years since the original *Frye* decision, to label the results of the polygraph examination as "unreliable," is that courts in more recent times have merely subjectively favored one side of a dispute in which there is a substantial and credible body of opinion on both sides of the question. (See *People* v. *Adams* (1975) 53 Cal.App.3d 109 [125 Cal.Rptr. 518].)

Before discussing the polygraph examination itself we first examine some of the general principles of the law of evidence as codified in California's Evidence Code to determine whether there is any statutory basis for a blanket exclusion of such evidence.

The Evidence Code enacted into law in 1967 was based on recommendations of the California Law Revision Commission promulgated after extensive study. Conceptually the Evidence Code, as a separate code, was designed to specifically articulate the rules of evidence for California courts. In most areas the Evidence Code was designed to preclude changes and developments in the rules of evidence except by legislative enactment.

"As a general rule, the code permits the courts to work toward greater *admissibility* of evidence but does not permit the courts to develop additional *exclusionary* rules. Of course, the code neither limits nor defines the extent of the exclusionary evidence rules contained in the California and United States Constitutions. The meaning and scope of the rules of evidence that are based on constitutional principles will continue to be developed by the courts.

"The proposed Evidence Code is to a large extent a restatement of existing California statutory and decisional law. The code makes some significant changes in the law, but its principal effect will be to substitute a clear, authoritative, systematic, and internally consistent statement of the existing law for a mass of conflicting and inaccurate statutes and the myriad decisions attempting to make sense out of and

to fill in the gaps in the existing statutory scheme." (Report and Recommendations of the California Law Revision Commission, January 1965, as republished in West's Annotated Codes (29B) Evidence Code, p. XXX.)

Setting the tone for the rules of evidence in California is Evidence Code section 351, which provides: "Except as otherwise provided by statute, all relevant evidence is admissible."

Stated another way, the rules of evidence are essentially rules of exclusion rather than admissibility. All relevant evidence is admissible unless there is a positive rule of evidence which excludes it. (*People* v. *Jones* (1954) 42 Cal.2d 219 [226 P.2d 38]; 1 Wigmore on Evidence, § 10, p. 293 et seq.)

The Law Revision Commission's comment to section 351 states: "Section 351 abolishes all limitations on the admissibility of relevant evidence except those that are based on a statute, including a constitutional provision. . . . The Evidence Code contains a number of provisions that exclude relevant evidence either for reasons of public policy or because the evidence is too unreliable to be presented to the trier of fact. . . . Other codes also contain provisions that may in some cases result in the exclusion of relevant evidence."

Evidence Code section 210 defines relevant evidence as "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

A trial court has discretion after a weighing process to exclude as "immaterial" otherwise relevant evidence which is deemed to be inordinately time consuming or prejudicial when compared to its probative value (Evid. Code, § 352). Further, the Evidence Code contains specific exclusion for evidence which, for policy reasons or for lack of reliability, are considered "incompetent" to prove any particular issue, although the terms "immaterial" and "incompetent" in this context are not perpetuated by the code.

In this latter connection the code contains two basic limitations on the use of opinion evidence, which come into play after the proffered evidence has passed the tests of relevancy and "materiality."

These limitations are as follows:

Evidence Code section 800 provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: (a) Rationally based on the perception of the witness; and (b) Helpful to a clear understanding of his testimony."

Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact, and (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

We present this rather lengthy and somewhat elementary description of the rules of evidence to demonstrate that the Evidence Code while providing for the specific exclusion of some types of evidence, contains no positive rule which provides a blanket exclusion of the results of a polygraph examination. In other words, assuming the relevancy and materiality of the issue to which the polygraph examination may be addressed, the Evidence Code contains no specific exclusion as "incompetent" for either the mechanics of the administration of the test or the opinion of the polygraph operator. The consistent and persistent rejection of polygraph evidence by the courts appears at this time to be based more on considerations of policy rather than any demonstrated lack of reliability or acceptance of the test. These policy considerations in turn appear to be based on the fear that evidence of the results of polygraph examinations will tend to usurp the function of the trier of fact, and that lay juries would tend to be overly impressed with the results of polygraph examinations. Whatever may be the validity of those considerations they are more properly matters for legislative rather than judicial determination.

When we consider the vast number of fields in which persons with some technical or specialized training are permitted to express an opinion (Evid. Code, § 720; also see Witkin, Cal. Evidence (2d ed. 1966)

pp. 370-384) together with the fact that Evidence Code section 805 permits the introduction of opinion evidence on the ultimate issue to be decided, those two policy arguments would seem to lack continued vitality. As of this writing, at least, the Legislature has not seen fit to articulate any such concern as to the use of expert testimony in general or the results of polygraph examinations in particular.

Since the case law up to this point has, in our opinion, failed to adequately delineate just what it is about the polygraph that has evoked the antipathy which is reflected in the almost universal barring of test results from being admitted into evidence, we think it important here to analyze the components of the polygraph examination.

The instrument itself is designed simply to measure mechanical changes in four physiological activities; (1) pulse rate and amplitude, (2) blood pressure, (3) respiratory activity, and (4) galvanic skin responses. Those activities are recorded on a continuing graph in a manner similar to the tracings of the familiar electroencephalogram, or electrocardiogram.

We pause here to observe that there can hardly be any question as to the ability of the instrument to perform those functions nor of the general acceptance in the scientific community of these types of measuring devices.

The qualified polygraph operator is trained in the operation of the instrument, the correlating of the tracings to the particular questions asked, and finally the techniques of the phrasing and sequencing of the questions. Again there appears to be no logical or legal barrier to the operator testifying to his qualifications and describing the objective mechanical results of the test.

That latter type of testimony involves no opinion. The operator simply describes what he perceived, i.e., certain tracings on the graph corresponding with the asking of particular questions. The trier of fact can then observe what changes occurred in the tracings from question to question. Objective verification by certain known facts such as age, name, address, etc. (so-called control type questions) can be established without resort to opinion evidence and the trier of fact can compare reactions to those questions with reactions to other questions.

The controversial aspect of the polygraph examination, of course, lies in the interpretation of the graph and the significance of the pattern changes if any. The underlying theory being that persons who consciously engage in deception evidence marked changes in the above mentioned four areas of physiological activity.

Whether that phenomenon is based on the existence of what is properly referred to as "conscience" or the existence of a natural fear of detection or whether the theory is valid are all questions which have their roots in the field of psychiatry or psychology, both of which disciplines have long been accepted by the courts as recognized fields of expertise. (*People v. Davis* (1965) 62 Cal.2d 791 [44 Cal.Rptr. 454, 402 P.2d 142]; *People v. Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]; *People v. Jones* (1954) 42 Cal.2d 219 [266 P.2d 38].)

Here defendant has offered, if given the opportunity, to establish that a qualified polygraph examiner can express a professional, expert and reliable opinion concerning the analysis of the examination, based on broad experience in examining a large number of individuals and verifying the results against objective criteria. He also purports to offer the results of a number of studies demonstrating the accuracy and significance of polygraph examinations.

We can perceive of no sound legal basis for denying defendant the opportunity to persuade a trial judge of the expert qualifications of the polygraph examiner and of the validity of the basic premises upon which the examiner's opinion is based.

Without seeming to appear facetious we suggest that to a degree the underlying premise that deception produces physiological reaction within an individual, who is within normal range of intellectual capacity and character, is a matter of common experience. Who but the most virtuous among us can honestly say that they have never experienced the rapid breathing, sweating in the palms of the hands and the feeling of "flushing" in the face connected with an attempt to deceive in even the most innocuous of situations?

When we allude to persons of "normal" intellect and character we touch upon one of the arguments advanced in opposition to the use of polygraph examinations, i.e., that persons with marked character defects, such as sociopaths will not respond to the polygraph, nor will persons with gross psychiatric disorders. There are those who contend

that some persons can by the use of various techniques "beat" the polygraph.

Although proponents of the polygraph contend that an experienced operator can detect such problems and deal with them no one has contended that the polygraph is fool proof under all circumstances, but what scientific or technical process is?

It appears to us that the arguments for and against the use of the polygraph examination in evidence are simply matters of proof to be developed by the opposing sides. The conflicting evidence can readily be presented to the trier of fact to be dealt with under proper instructions and by the application of the general rules which govern the use of all types of evidence. In short, there is, in our opinion, nothing so unique about the polygraph examination that justifies the courts continuing to treat it as an evidentiary pariah.

Once the perceived novelty of the polygraph has "worn off" we are confident that lay juries will be able to treat and deal with that form of evidence in as judicious a manner as they presently deal with medical, psychiatric and other forms of technical evidence.

Evidence Code sections 801 through 805 provide adequate machinery for the trial court to exclude the opinion testimony of unqualified persons or the proffering of opinions which lack a proper basis or foundation. Evidence Code sections 400 through 406 provide adequate procedure whereby the court can bar the use of evidence which proceeds from unproven necessary preliminary facts and finally Evidence Code section 352 provides the court with ample ability to prevent esoteric ventures into the unknown.

None of these aforementioned provisions nor any statutory provision of which we are aware provides a basis for simply, in all cases, excluding the use of the results of a polygraph examination and denying the party proffering the evidence an opportunity to establish its relevancy, materiality and competency. A judicial proceeding is supposed to be a search for the truth. Any evidence which will facilitate that objective should be accepted by the courts absent a constitutional prohibition, or a specific statutory exclusion.

The function of providing for the exclusion of certain types of evidence on the basis of form, lack of reliability or public policy, is one for

the Legislature rather than the courts. It does not further the effective administration of justice for a court, on the basis of its own subjective reasons, to simply bar the use of otherwise valid relevant evidence.

We are not unmindful of the fact that the use of the results of polygraph examinations as evidence may pose some procedural problems which will have to be dealt with. Those problems, however, can be resolved by legislation which either totally excludes evidence of the results of polygraph examinations or, on the other hand, establishes a procedure which prescribes when and under what circumstances such evidence may be used. Until such legislation is forthcoming, however, it is our opinion that evidence of the results of a polygraph examination can be dealt with under the provisions of the Evidence Code and the procedures which presently exist for other types of physical and mental examinations of individuals involved in litigation.

Let a peremptory writ of mandate issue directing the trial court to grant defendant's motion and to hold an evidentiary hearing consistent with what we have here stated.

Beach, J., concurred.

**GATES, J.**—I concur in my colleagues' decision to the extent that it determines that *in this instance* the petitioner is entitled to the evidentiary hearing he seeks. I decline, however, to speculate what such evidence, *when introduced*, may or may not establish regarding the reliability of polygraph testing or its acceptance in today's scientific community.

I also deem it important to stress the most limited nature of the question presently before us. During his oral presentation before this court, petitioner's counsel emphasized the fact that petitioner (1) heretofore has offered to undergo further polygraph testing by "qualified examiners"[1] selected by the People or appointed by the court, or both, and (2) stands willing to fully cooperate with any other orders that may be promulgated by the trial court to ensure the integrity, accuracy, and fairness of any evidence relating to such tests, including the one he has heretofore taken.[2]

---

[1] Naturally it must be understood that this expression assumes that there is evidence sufficient to establish that the state of the polygraphic art has now advanced to the point that there are persons to whom such an appellation may properly be applied.

[2] Petitioner's counsel further stated that he had no objection to the People administering similar tests to their witnesses and introducing the results into evidence. We dared

It is, of course, well established that evidence regarding polygraph examinations is of sufficient relevance and probative value that it will be received in a criminal proceeding in this State if the parties have so stipulated. (*People* v. *Trujillo* (1977) 67 Cal.App.3d 547, 554 [136 Cal.Rptr. 672], and *People* v. *Reeder* (1976) 65 Cal.App.3d 235, 238 [135 Cal.Rptr. 421], and cases cited therein.) The only novel question to be resolved by the hearing to be conducted in this instance is: "Has the theory and practice of polygraphy today achieved that degree of reliability and acceptance that a trial court may now promulgate rules for its receipt even though one party to the proceeding, here the People, initially has declined to have experts of its choosing conduct appropriate tests of a witness for the other party, here the defendant himself, despite the fact such witness has manifested his willingness to submit himself thereto and it is agreed that the results of all such tests, will thereafter be admissible whether favorable or unfavorable to either side?"

In *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 189 [133 Cal.Rptr. 511, 555 P.2d 297], our Supreme Court rather clearly indicated that, as with all questions regarding any potential field of expertise, defendants must, from time to time, and upon proper and timely showings, be permitted to examine into the advancements that have been made therein in an effort to establish that sufficient reliability and acceptability has been achieved to warrant receipt of opinion evidence regarding it. (See also *People* v. *Adams* (1975) 53 Cal.App.3d 109 [125 Cal.Rptr. 518].)

I agree with my colleagues that it certainly would have been preferable for the Legislature, rather than the courts, to have undertaken the type of lengthy and in depth analysis that must be conducted in order adequately and properly to explore and evaluate the myriad arcane nuances of polygraphy. In view of the many "battles of the experts" that now engage our courts and excite the interest of press and public alike, even the not overly cynical observer[3] might be forgiven a small involuntary shudder of apprehension at the prospect of seeing yet another area of strife developed, particularly one that is to delve directly to the very core of every judicial proceeding, i.e., the credibility of witnesses.

---

not inquire if he also believed that those experts who conduct polygraph tests should themselves be examined before trial by other experts in order to verify the content of their testimony, etc.

[3]A truly cynical onlooker might conclude that poor and lonely indeed is he who cannot locate at least one "expert" to express a favorable opinion on any given subject.

We can but hope that whatever determination ultimately may be made in the instant proceeding, the Legislature will promptly move to establish what it perceives to be the truly appropriate rules, regulations, restrictions or out right bans, that should prevail in this most important and vexed area. For the present, however, I can but agree that since either condemnation or affirmation prior to investigation is always inappropriate, petitioner is entitled to his day in court.

A petition for a rehearing was denied July 19, 1982, and the petition of real party in interest for a hearing by the Supreme Court was denied August 18, 1982.