226 N.J. Super. 605 (1988)
545 A.2d 230
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM SLOAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 27, 1988.
Decided July 25, 1988.
*607 Before Judges KING, GAULKIN and D'ANNUNZIO.
J. Michael Blake, Assistant Deputy Public Defender, argued the cause for appellant (Alfred A. Slocum, Public Defender; J. Michael Blake, of counsel and on the brief).
Elizabeth Miller-Hall, Assistant Prosecutor, argued the cause for respondent (Herbert H. Tate, Jr., Essex County Prosecutor; Elizabeth A. Duelly, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
The issue is whether defendant was denied effective assistance of counsel because his trial counsel did not subject defendant to a lie-detector pre-test before defendant submitted, pursuant to a stipulation, to a lie-detector test administered by the Essex County Prosecutor's office.
On March 27, 1980 a jury convicted defendant of rape (N.J.S.A. 2A:138-1) and of rape while armed (N.J.S.A. 2A:151-5). Defendant was sentenced to five to seven years imprisonment on the rape charge and to a consecutive term of one to three years on the rape while armed charge. Defendant appealed and we affirmed his conviction in an unreported opinion on July 8, 1981 (Dkt. A-4111-79-T4). Defendant's petition for certification to the Supreme Court was denied. State v. Sloan, 88 N.J. 484 (1981).
On May 16, 1986, defendant filed a petition for post-conviction relief, alleging that he had been denied the effective assistance of counsel. After a hearing, the petition was denied. Defendant now appeals.
Based on the evidence, the jury could have found that on December 26, 1978, S.T. and defendant were in the Kings and Queens Bar on Halsey Street in Newark. Defendant approached *608 S.T. and the two began to talk. After several drinks, S.T. left with defendant who had offered to drive her to a bus stop. As they were leaving the Kings and Queens Bar, defendant suggested that they get something to eat. They stopped briefly at another tavern which did not serve food, and S.T. asked defendant to take her to a bus stop. Defendant then stated that he knew of another bar down the street which served food. While running across the sidewalk to the bar, S.T. heard what she described as a "clunk". Turning around, she observed a gun on the pavement. She asked defendant what the object was and he responded "That's my gun."
At the third bar, defendant made romantic overtures toward S.T. which were rebuffed. Following this rejection, defendant stated that he would take her home. S.T. left with defendant, believing that he was taking her to a bus stop. Instead, he took her to the Sussex Mall Shopping Plaza.
At the mall, defendant drew a gun on S.T. and indicated that he intended to have intercourse with her. Frightened, S.T. attempted to stall defendant by suggesting that they go to a motel. Defendant continued to brandish the weapon and threatened to kill S.T. if she did not get undressed. Shortly thereafter, he forced S.T. to have sexual intercourse.
Thereafter, defendant drove S.T. to a bar called Umojo's where he gave her five dollars to get a taxi. He also informed her that she could notify the police or anyone else if she wanted. Upon entering the tavern, S.T. approached a bartender, informed him of the rape and requested assistance. The bartender arranged for transportation to her home.
Initially S.T. did not tell her family about the incident. However, the following evening, she told her sister-in-law about the attack and, shortly thereafter, reported the incident to the Newark Police Department.
At trial, defendant testified that upon meeting S.T., it was his intention to have intercourse with her and that he had lied to her in his attempt to persuade her to submit to his advances. Defendant also testified that S.T. did not resist his advances *609 and that she seemed to be falling in love with him. But later in the evening defendant offered S.T. fifty dollars to have intercourse with him. Defendant further testified that prior to leaving the bar, S.T. asked him whether he was carrying a gun under his jacket. On direct, the defendant claimed that he merely laughed at her query and did not respond. However, during cross-examination, he sought to explain his reaction by stating that what S.T. felt was his electronic beeper.
According to defendant, S.T. agreed to have intercourse with him for fifty dollars. He testified that after taking her to the Sussex Mall and engaging in sexual intercourse there, he began to drive her home. Defendant became annoyed when S.T. asked for the fifty dollars, a sum he had no intention of paying. Defendant claimed that he stopped his car and ordered her to get out. Before he drove away, defendant gave S.T. some money to get home.
Prior to trial, defendant's counsel, Norman Fishbein, arranged for defendant to submit to a polygraph examination to be administered by the prosecutor's office. Pursuant to this arrangement, defendant and the State entered into a signed stipulation. According to the defendant's testimony at the post-conviction relief hearing, Fishbein[1] had not arranged for defendant to undergo a privately administered polygraph test prior to entering into the stipulation with the State nor had Fishbein discussed the possibility of a pre-test with defendant.
The polygraph was administered to the defendant on January 29, 1980 by investigator Theodore P. Cielecki. Defendant had come to the prosecutor's office on January 4, 1980 to undergo the test but was advised by Cielecki not to undergo the test on that date due to the fact that defendant's wife was hospitalized. On both occasions defendant signed a stipulation pursuant to which the results of the polygraph would be admissible at trial. Defendant testified at the trial and at the post-conviction hearing that he did not read the stipulation before he signed it.
*610 Pursuant to the stipulation, Investigator Cielecki testified at defendant's trial and was permitted to express his opinion that defendant had given deceptive answers to three questions asked during the polygraph examination. The three questions and answers were as follows:
Q: Do you know for sure if anyone forced [S.T.] to have sex on December 26, 1978?
A: No
Q: On December 26, 1978, did you force [S.T.] to have sex with you?
A: No
Q: Have you told me the complete truth of your actions as to what happened with [S.T.]?
A: Yes
Fishbein objected to the admission of Cielecki's testimony regarding the polygraph test. Fishbein asserted that the prosecutor's office had suggested the polygraph test. Fishbein further testified at trial[2] that it was his and defendant's understanding that the purpose of the polygraph was limited to the question of whether defendant had a gun in his possession on the night in question. Fishbein stated that although defendant was initially reluctant to submit to the test, defendant agreed to submit to the test after Fishbein told him that the gun would be the crux of the case and that if it could be shown that he did not threaten and rape S.T., the prosecutor would no longer be interested in prosecuting.
The trial judge did not find bad faith on the part of the prosecutor, although he concluded that there had been a misunderstanding. Nevertheless, the trial judge refused to void the stipulation, finding that Fishbein and defendant signed the stipulation with full knowledge of the implications of its provisions. The trial court then held that defendant was bound by the stipulation agreement because it believed that Fishbein's decision was "knowingly based on [his] years of experience."
*611 At the post-conviction relief hearing, defendant claimed that prior to undergoing the polygraph examination Fishbein told him that the prosecutor's office was only concerned with whether he possessed a gun on the night in question. Defendant testified that it was his belief that if the polygraph did not reveal that he had a gun in his possession, he would be cleared of all charges.[3] Defendant also testified that he did not read the stipulation prior to signing it because it was lengthy[4] and he preferred to rely on Fishbein and Assistant Prosecutor Rosenfeld's explanation of the form. Defendant admitted that he had discussed the possibility of a polygraph with Fishbein on numerous occasions prior to signing the stipulation form.
Dale Jones, Director of Capital Litigation in the Office of the Public Defender, testified at the post-conviction relief hearing as an expert in criminal litigation. Jones testified that it would be ineffective assistance of counsel for an attorney to place a client accused of rape on a stipulated polygraph without first subjecting the client to a pre-test. Jones indicated that a failure to pre-test would not meet prevailing professional norms in the State of New Jersey.
Defendant contended that he was denied effective assistance of counsel because: (1) Fishbein misunderstood the scope of the stipulation and, therefore, did not adequately advise defendant with regard to it; (2) Fishbein failed to subject defendant to a polygraph pre-test.
Judge Degnan[5] denied the petition on the grounds that defendant's first contention had been raised on direct appeal *612 and had been rejected, R. 3:22-5, that the second contention was closely related to the argument advanced on direct appeal, and, in any event, could have been raised on direct appeal. R. 3:22-3; R. 3:22-4. Judge Degnan also ruled that the five-year limitation in R. 3:22-12 did not bar the petition because the delay in filing the petition was due to excusable neglect.[6]
We agree with Judge Degnan that defendant's contention that Fishbein had not adequately understood or explained to him the meaning of the polygraph stipulation is barred under R. 3:22-4 and 5. On his direct appeal defendant contended that admitting the polygraph test results in evidence was error because "there was substantial evidence that there had not been a meeting of the minds regarding the use of the polygraph testing beforehand." We rejected this contention. However, we address the merits of defendant's second contention, that failure to pre-test constituted a deprivation of the effective assistance of counsel. There is merit to defendant's argument that his pre-test contention could not have been raised on direct appeal because it was based on testimony outside the trial record, e.g., Dale Jones' expert testimony. R. 3:22-4(a). See Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). "Because collateral review will frequently be the only means through which an accused can effectuate the right to counsel, restricting the litigation of some Sixth Amendment claims to trial and direct review would seriously interfere with an accused's right to effective representation." Id., 477 U.S. at 378, 106 S.Ct. at 2585, 91 L.Ed.2d at 321. Moreover, because the right to counsel is a fundamental constitutional right, Id., and because defendant's contention implicates the validity and effectiveness of polygraph stipulations, the issue should be addressed. R. 3:22-4(c).
*613 In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court, in synthesizing existing federal decisions, announced a two-element standard to be applied in evaluating claims of ineffective assistance of counsel. The defendant must establish that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. The "standard for attorney performance is that of reasonably effective assistance." Id. at 687, 104 S.Ct. at 2064. To establish prejudice "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068. There is a strong presumption that counsel's performance falls within the wide range of professional assistance, and defendant bears the burden of proving that counsel's representation was unreasonable. Kimmelman v. Morrison, supra. Recently the New Jersey Supreme Court adopted the Strickland standard in applying New Jersey's guarantee of counsel. State v. Fritz, 105 N.J. 42 (1987); N.J. Const. (1947), Art. I, par. 10.
We conclude that defendant did not carry his burden of proof.
In evaluating trial counsel's performance, we begin with the premise that defendant's lie-detector test was a reliable indication of defendant's credibility. We accept this premise because it is the basis of the admissibility of the lie-detector test pursuant to the stipulation between defendant and the State.
Prior to State v. McDavitt, 62 N.J. 36 (1972), lie-detector tests were inadmissible because they had not attained acceptance as a reliable means of determining credibility. State v. Driver, 38 N.J. 255 (1962). Although this general rule prevails in New Jersey, the Court in McDavitt created an exception which admitted evidence of lie-detector test results pursuant to a stipulation between the parties. After taking judicial notice of the widespread use of lie-detectors in law enforcement and in the private sector, the Court ruled:

*614 We conclude that polygraph testing has been developed to such a point of reliability that in a criminal case when the State and defendant enter into a stipulation to have defendant submit to a polygraph test, and have the results introduced in evidence, such stipulation should be given effect. [Id., 62 N.J. at 46].
In State v. Valdez., 91 Ariz. 274, 371 P.2d 894 (1962), the Arizona Supreme Court approved the admissibility of polygraph test results under a proper stipulation, stating that "we think it [lie-detector] has been developed to a state in which its results are probative enough to warrant admissibility upon stipulation." Id., 371 P.2d at 900. Similarly, in State v. Renfro, 96 Wash.2d 902, 639 P.2d 737 (1982), cert. den. sub nom. Renfro v. Washington, 459 U.S. 842, 103 S.Ct. 94, 74 L.Ed.2d 86 (1982), the Washington Supreme Court ruled that lie-detector test results were admissible under a stipulation between the State and the defendant:
The results of the polygraph examination are admitted not because the test is completely reliable, but because it is reliable enough to be relevant. Both parties, each from a different perspective, believed the result of the polygraph examination would be relevant to the case and by their stipulation waived any question as to the degree of the reliability of the polygraph. [639 P.2d at 739; emphasis added].
In State v. Dean, 103 Wis.2d 228, 307 N.W.2d 628 (1981), the court explained:
If either party is not convinced of the reliability of polygraph testing, the party can refuse to stipulate to the test.... As the court further explained in Robinson v. State, 100 Wis.2d 152, 162, 301 N.W.2d 429 (1981), `[t]he stipulation requirements set up by this court in Stanislawski permits each of the parties to make an independent evaluation of the reliability of polygraph evidence and their willingness to rely on it.' [307 N.W.2d at 637].
Thus, admissibility of a stipulated lie-detector test is based on judicial recognition of increased acceptance of the test's reliability and on the agreement between the parties that the test is reliable. In the written stipulation utilized in the present case, defendant and the State agreed "that polygraph examination procedure has developed to such a degree of reliability that when the State and a defendant enter into a stipulation to have *615 the results of a polygraphic examination introduced into evidence, such a stipulation will be given effect."
The premise of test reliability in this case is enhanced by the absence at trial and at the post-conviction relief hearing of any expert testimony challenging the reliability of the test as administered or the conclusions of Cielecki, the polygraph examiner. See State v. Baskerville, 73 N.J. 230 (1977) (defendant may introduce evidence of a polygraph expert to counter testimony of the designated examiner). Cf. State in Interest of B.N., 167 N.J. Super. 370 (Cty.Court 1979) (defendant may introduce evidence of polygraph exam other than the stipulated exam to refute the result of the stipulated exam).
Defendant has not established that he told his trial counsel that he was, indeed, guilty of the crimes charged. We infer, therefore, that defendant had represented to his trial counsel that he was innocent of the crimes charged. Distilled to its essence, defendant's complaint is that his trial counsel relied on defendant's representations. We conclude that counsel's reliance on his client's representations to him about an event witnessed only by defendant and S.T. does not constitute deficient performance under Strickland and Fritz. As a result of defendant's representations, and based on the premise of the reliability of the lie-detector test, trial counsel had every reason to expect that the examiner would conclude that defendant's answers were truthful. See State v. Renfro, supra, in which the court rejected defendant's claim that he was denied effective assistance of counsel when his lawyer allowed him to enter into a polygraph exam stipulation and to submit to the lie-detector test.
We also observe that defendant was the party in interest in this prosecution. Although defendant's trial counsel also signed the stipulation, the stipulation, including defendant's agreement as to the reliability of the lie-detector tests, was between defendant and the State. Application of the premise of reliability leads to the conclusion that defendant was untruthful *616 when he denied raping S.T. Defendant was in the best position to know whether his responses to the examiner's questions would be truthful. We see nothing unfair or inappropriate in burdening defendant with the consequences of his deceptive responses to the examiner's questions. Cf. People v. Reeder, 65 Cal. App.3d 235, 135 Cal. Rptr. 421 (Ct.App. 1976), which rejected defendant's contentions that a polygraph stipulation establishes ineffective counsel. "Defendant is no less bound by it merely because what might have been a winning stratagem turned out to be a foolhardy gambit." Id., 65 Cal. App.3d at 240-241, 135 Cal. Rptr. at 423-424.
We also observe that if defendant's contention prevails then stipulated polygraph tests will not be effective in those cases in which deceptive responses are detected. Prior to the stipulated test, a prosecutor would not know whether or not defendant had been pre-tested. In that circumstance, defendant can veto use of the test, or invalidate a subsequent conviction on the ground that his lawyer failed to pre-test.
Finally, we conclude that defendant has not carried his burden of establishing a reasonable probability that the trial result would have been different in the absence of the polygraph testimony. On direct appeal we observed:
The proof of defendant's guilt was overwhelming. Moreover, his own essentially implausible narrative of the events on the night in question included his admissions: (1) that he had sexual intercourse with the victim, although he claimed this was with her consent; (2) that from the time he met the victim in the Kings and Queens Restaurant his "intention" was "to make" her; (3) that although the victim "seemed to be falling in love with him", "hugging" and "kissing" him and "becoming more and more intimate" with him, he offered her $50 to have sex with him, and that he told her all he needed was "just 2 minutes"; and (4) that after he had intercourse with the victim he "kept her for about half an hour."
Defendant has produced nothing to change our appraisal of the evidence.
Affirmed.
NOTES
[1] Fishbein died prior to defendant's petition for post-conviction relief.
[2] The trial judge conducted a hearing regarding the admissibility of Cielecki's testimony and the polygraph examination. Evid.R. 8.
[3] During the polygraph test defendant answered questions about his possession of a gun. Defendant's physiologic responses associated with these answers were deemed to be inconclusive. Pursuant to the stipulation, inconclusive responses were not admissible.
[4] The polygraph stipulation consisted of five typed pages.
[5] Judge Feinberg had presided at trial.
[6] The State has not cross-appealed from or otherwise challenged the ruling that the petition was not time barred.