793 A.2d 720

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
KENNETH BANKS, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted November 13, 2000—Decided February 9, 2001.

Before Judges PETRELLA, BRAITHWAITE and WELLS.

*Donald C. Campolo,* Assistant Attorney General, Acting Essex County Prosecutor, attorney for appellant (*Barbara A. Rosenkrans,* Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the letter brief).

*Joel M. Harris,* First Assistant Public Defender, attorney for respondent (*William Welaj,* Designated Counsel, of counsel and on the brief).

PER CURIAM.

The State appeals, by leave granted, from the grant of defendant's petition for post conviction relief. The State contends that the Law Division judge erred in concluding that defendant's trial counsel was ineffective because he failed to interview a witness, prior to her testimony, who was scheduled to testify that "around the time of the alleged incident," defendant was with her. We agree with the State and now reverse. Following a jury trial, defendant was convicted of first-degree robbery, *N.J.S.A.* 2C:15–1; fourth-degree aggravated assault, *N.J.S.A.* 2C:12–1b(4); third-degree unlawful possession of a handgun, *N.J.S.A.* 2C:39–5b; and second-degree possession of a handgun for an unlawful purpose, *N.J.S.A.* 2C:39–4a. At sentencing, the judge granted the State's motion for the imposition of an extended term pursuant to *N.J.S.A.* 2C:44–3a. After merging the aggravated assault and possession of a weapon for an unlawful purpose conviction, defendant was sentenced to a custodial term of twenty-five years with a twelve and one-half year period of parole ineligibility on the robbery conviction and to a concurrent five-year term on the

possession of a handgun conviction. We affirmed defendant's convictions and sentence. *See State v. Banks*, A5089–95 (App.Div. August 27, 1997), *certif. denied*, 152 *N.J.* 364, 704 *A.2d* 1299 (1998).

The underlying facts supporting defendant's convictions are set forth in our prior opinion. We repeat them here.

> On August 14, 1995, at approximately 8:30 a.m., Suzette Carter and her two young children were waiting at a bus stop in Newark. Defendant approached Carter and demanded her jewelry. Defendant showed Carter a gun that he had tucked in his shorts and ordered Carter and her children into a nearby driveway where he could complete the robbery.
>
> Once in the driveway, Carter's son became frightened and ran out of the driveway. Defendant ordered Carter to call her son back, which she did. When the boy returned, defendant put the gun to the child's head, took Carter's jewelry and demanded money. When Carter told defendant that she had no money, defendant stated that he would shoot her son if she was lying. After going through Carter's pocketbook and finding no money, defendant fled the scene.
>
> Carter then called her God-sister to report what had occurred. Carter's God-sister and cousin got into the cousin's car and proceeded to Carter's apartment. Carter then called the police. Thereafter, while looking out of her apartment window, Carter saw defendant. Before the police arrived, Carter and her cousin got into the cousin's car and followed defendant so that Carter could be sure that defendant was the person who had committed the robbery. Carter told her cousin that defendant was the perpetrator. Carter's cousin and sister followed defendant to his destination.
>
> Subsequently, the police arrived and were told of defendant's whereabouts. Defendant was arrested, and Carter identified him as the person who committed the robbery approximately ninety minutes after the incident. Carter stated that defendant's appearance had changed between the robbery and his arrest. He had on different clothes, and his hair was combed differently. Carter, however, was positive that defendant was the person who committed the robbery.

On June 16, 1998, defendant filed a *pro se* petition for post conviction relief contending that: his trial counsel was ineffective because of "tainted out of court identification [and] improper jury instructions." Thereafter, counsel was assigned to represent defendant for his post conviction relief petition. Counsel amended defendant's petition to allege ineffective assistance of counsel on the following grounds: (1) failure to request mistrial or curative instruction when jury heard petitioner was on probation; (2) failure to present alibi witness (after opening to the jury with an alibi defense); (3) failure to object to jury charge not conforming to facts of case; (4) failure to consult with and discuss trial

strategy with petitioner; (5) failure to motion for a new trial or judgment of acquittal; (6) failure to object or request mistrial or curative instruction regarding prosecutors remarks in summation; (7) failure to object to prosecutors improper opening remarks and instructing the jury on the law of misidentification; and (8) ineffective assistance of appellate counsel. The State opposed defendant's petition.

The Law Division judge rejected all of defendant's claims except the claim of ineffective assistance of counsel based upon counsel deficiencies involving the defense of alibi. The judge scheduled an evidentiary hearing, at which time defendant's trial counsel testified.

It is clear from the record that defense counsel filed a notice of alibi pursuant to *Rule* 3:12–2, signed by counsel and defendant. In the notice, counsel stated that defendant "may" rely on the defense of alibi and that the witness, defendant's girlfriend, Rhonda Caldwell ("Caldwell"), "will establish that defendant was with her on public transportation between Newark and Elizabeth around the time of the alleged incident." The alibi information was provided to counsel by defendant.

Defense counsel attempted to interview Caldwell before trial for two purposes. First, the interview was to cover defendant's claim that the charges against him were retaliation by the victim because defendant had "beaten up" the victim's boyfriend. Counsel sought information about the fight between defendant and the victim's boyfriend from Caldwell. Second, counsel sought to interview Caldwell about defendant's whereabouts on the date and time of the robbery. However, Caldwell could not be located for an interview at that time.

Prior to trial, counsel subpoenaed Caldwell to appear for trial on January 31, 1996. She did not appear. Following jury selection, defense counsel made his opening statement where he said in part:

But there is a different scenario, and I think when I explain certain things to you you will understand why there is an issue of fact. The defendant says I didn't do it. That's the first thing. Not me, you got the wrong person. So we have a

question of identification. We have an issue as to where the defendant was at the time. You will hear testimony that it was approximately 8:30 in the morning, that Suzette Carter and her children were at a bus stop. Mr. Banks says I spent—this was a Monday morning. I spent the weekend at my girlfriend's house in Elizabeth. At that time the girlfriend's name was Rhonda Caldwell. She was living at 112 West Jersey Street in Elizabeth. On Monday morning they left his girlfriend's house and they went, eventually, to South 19th Street which is where the defendant lived. They took buses, two buses. They took the 24 bus from Elizabeth to downtown Newark and the 31 bus up South Orange Avenue. They got off at South 19th Street, walked a couple of blocks to the defendant's house which was I believe located between 14th and 15th Avenues.

At no time in the route that they took did they pass Littleton and 16th Avenue which is the address where Ms. Carter was waiting for the bus.

Counsel then pointed out that the State's theory of the case required the jury to believe that about one and one-half hours after the crime at approximately 8:30 a.m., defendant was spotted in the neighborhood of the crime on 16th Avenue and was chased back to his own house. Counsel further pointed out that the police found neither the gun nor any of the jewelry when they arrested defendant. Counsel then said:

These are some of the things I want you to be thinking about because the State has got to convince you beyond a reasonable doubt. They have to convince you that they've got the right guy, that he was present at the location of the robbery and that he's the person who committed these offenses, and when you hear the testimony, you know, you're going to learn that there was no jewelry, that there was no gun found, and too, you know, ask yourselves well, is this the kind of thing that can be the basis for a doubt or can be the basis for a reasonable doubt. Absence of testimony is something that you are entitled to use and say well, they haven't proved it.

What they're going to be able to show is some people chased the defendant in his home. Does that mean that an hour and a half before that he was at the same location committing a robbery. I think the issues are fairly clear. He's saying I have an alibi defense, I was some place else at the time, that is 8:30. I wasn't there. I'm walking down the street and all of a sudden some guys come chasing me and they go chase me to my house, but I have nothing to do with any robbery. I have no knowledge of any robbery. I didn't do it, and they never found anything on me that ties me to the robbery. No gun, no jewelry, no nothing.

Thus, defense counsel's opening statement was a full explanation of defendant's defense which was a direct denial of the charges. Part and parcel of that defense, was the defense of alibi. *State v. Garvin,* 44 *N.J.* 268, 272, 208 *A.*2d 402 (1965).

Subsequent to the opening statements, the State put forth a case that established the facts set forth above. On February 1, 1996, Caldwell appeared at trial. She did not testify that day but returned on February 6, 1996, at which time she testified. Defense counsel did not interview Caldwell concerning her testimony.

On direct examination, Caldwell testified that defendant had spent the weekend with her in Elizabeth and that on the following Monday morning, August 14, 1995, the date of the robbery, she and defendant left her residence to go to defendant's residence in Newark. The following questions and answers were provided:

Q   And do you have a specific address in Newark that you were going to?

A We were going to Kenneth's house.

Q   And do you know what Kenneth's address was?

A No, I don't. I think it's 18th Street.

Q   Now, how were you planning to get from your house in Elizabeth to Kenneth's house?

A The bus.

Q   Okay. Do you remember the number of the bus?

A The 24 and the 31.

Q   You had to take more than one bus?

A Yes.

Q   And do you know the routes that these buses took?

A Yes.

Q   Want to tell us what they were?

A It takes you from Broad Street in Elizabeth to Broad Street, downtown Newark. It's the 24. We took the 31 from Market Street to South Orange Avenue in Newark.

Q   And did there come a time when you got off the bus?

A Yes.

Q   And where did you get off the bus at?

A At the corner of 18th Street.

Q   And what other street?

A South Orange Avenue.

Q   Okay. Okay. Now, do you have any idea at all as to what time it was that you were on the buses from Elizabeth to Newark?

A Between 7 and 7:30.

Q   And how about when you got into Newark and taking in the 31 up to Kenneth's house.  You have any idea what time it was at that time?

A It had to be between 7:30 and 8 o'clock.

Q   Now, do you have any idea as to where Kenneth might have been around 8:30 in the morning on that August 14th?

A In his house.

Q   Were you with him at that time?

A No, I wasn't.

Q   Now, where were you going when you left?

A I had an appointment at 9:30.

Q   And how were you going to get to your appointment?

A The bus.

Q   Now, did you have a watch on with you that day?

A No, I didn't.

Q   So, when you're giving us approximations of time, is this just guesses on your part?

A No, I had the time on my beeper.

Q   You have a beeper?

A Yes.

Q   Now, did you walk to Kenneth's house or did you go to Kenneth's house?

A Yes, I did.

Q   And you have any idea as to what time it was at that point?

A No.

During cross-examination, a rather contentious exchange occurred between the prosecutor and Caldwell.

Q   What time did you leave Elizabeth that morning?

A Between 7 and 7:30.

Q   And how do you know it was at that time?

A The time on my beeper.

Q   What time did your beeper say?

A I don't know, between 7 and 7:30.

Q   Well, you just said you knew it was that time because of the time on your beeper, didn't you?

A Yes.

Q   And you just said that you don't know what time your beeper said, did you?

A I said between 7 and 7:30. 1 don't know the exact time.

Q   Does your beeper only keep time by half hours or does it keep times by—strike that.   You have a problem with the time on your beeper?

A No.

Q   You have no idea what time it was, do you?

A Between 7 and 7:30.

Q   Well, your beeper didn't keep good time, did it?

A Excuse me?

Q   Your beeper didn't keep good time, did it?

A I guess not if you want to say so.

Q   You just testified your beeper didn't keep good time, didn't you?

A No, I didn't say that.   You said that.   You said, did you have a watch on.

Q   Did you just testify that you had problems with your beeper?

A Yes, just to you.

Q   And your beeper didn't keep good time.   Isn't that one of the problems that you had with it?   Do you understand the question?

A Yes, I do.

Q   Do you understand you have to answer it?

A Yes.

Q   What is your answer?

A That's the time I gave you, 7 to 7:30.

Q   That's the time you gave us.

A You don't care what time it was, do you?

Q   Yes, I do.

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Sustained.

BY MR. BROWN:

Q   You came here to give a certain time, didn't you?

A No.

Q   You came here to say between 7 and 7:30, didn't you?

A No.

Q   You came here intending to say exactly what you said, didn't you?

A No.

Q   You intended to come here to establish an alibi to this defendant, didn't you?

A No.

Q   You have no idea what time it was that morning, do you?

A I said between 7 and 7:30.

Q   You're going to stick to that, right?

A Yep.

Q Because that's what you decided to come here and say, isn't it?

A Nope.

Q Other than your beeper, how do you know it was between 7 and 7:30?

A That's the only time I know.

Q That's the only time you know?

A Yep.

Q And your beeper didn't keep good time, did it?

A I guess not if you don't think so.

MR. BROWN: Not responsive, your Honor. I would ask that you ask the witness to respond to the question.

[DEFENSE COUNSEL]: I think we've established this.

THE COURT: I think you've established and the witness is reluctant to answer.

BY MR. BROWN:

Q What time did you leave the defendant that day?

A I don't know, as soon as I dropped him off at the house.

Q You don't know what time it was?

A No.

Q Could it have been before 8:30, couldn't it?

A Could be.

Q You don't know where he was at 8:30, do you?

A No.

Q You don't know if he robbed somebody that morning, do you?

A Nope.

## Caldwell's final testimony occurred during re-direct:

Q Ms. Caldwell, well, the Prosecutor is talking a lot about times. Now, was there any specific reason for you to keep looking at your beeper to check the time?

A No.

Q You already told us you had no watch.

Q Is that correct?

A Yes.

Q And you had to be at this appointment at Mt. Prospect Street at 9:30?

A Yes.

Q Was there any other particular reason for you to pay attention to the time?

A No.

Q And just like the Prosecutor asked you could have dropped off Kenneth before 8:30, you could have also dropped him off after 8:30. Isn't that true?

A Yes.

Q  And Kenneth, has he ever told you the time that he's accused of this robbery occurring?

A No.

Q  Even now you don't even know what time the robbery supposedly occurred?

A No.

Q  Never discussed that with you?

A No.

Q  Did he ever ask you to come into court and establish an alibi for him?

A No.

Q  Is what you testified the truth?

A Yes.

Q  Regardless of the time?

A Yes.

Defendant asserted in his petition for post conviction relief that his trial counsel promised an alibi defense and then failed to deliver on that defense before the jury, thereby rendering ineffective assistance of counsel. Following an evidentiary hearing, the Law Division judge granted defendant's petition. In granting the petition, the judge said in part:

Although the jury was clearly [told] at the outset during opening statements that the defense of misidentification would be, to a large extent, premised on an alibi to be provided during the course of the trial, the alibi witness could not corroborate the alibi of Mr. Banks.

Clearly, this was not a choice among strategic alternatives on the part of defense counsel which clearly this Court should give great deference too. But in this instance the Court finds that there was a conscious decision and a choice of a defense, that the defense had been identified and had been discussed with the client, but unfortunately without ascertainment of its underlying factual support.

The conviction—the counsel clearly did not interview the alibi witness at any time before she took the stand. Again, although it's quite clear as to the materiality of that particular defense, as heretofore indicated in the notice of alibi, counsel did not seek a continuance from the Court in order to have a full opportunity to interview the purported alibi witness.

This instance is simply, in this Court's judgment, a significant instance of inexcusable lack of preparation and failure on the part of counsel to inquire into the facts that would support his case. And any objective assessment of performance, which this Court is obligated to undertake and which the Court does not undertake lightly, demonstrates to this Court a serious deficiency in the representation of Mr. Banks.

The error, the deficiency in this instance, is not the product of poor strategy to which the Court must give great deference, or unpredictable, or unexpected, or unforeseeable testimony, to which the Court must give great deference, but it's a direct result of a lack of mandated preparation. This error was so serious as to fall in this instance below what is expected, in this Court's opinion, under the sixth amendment and the New Jersey Constitution Guarantee of Effective Assistance of Counsel.

The assistance of counsel and the presentation of a defense was plainly ineffective. The seriousness of the error, moreover, is compounded in this particular instance by a realistic appreciation by defense counsel, not only as to the materiality and significance of the alibi defense to a successful defense for his client, but also on an understanding of the inability of his client to take the stand because of prior criminal convictions.

Good lawyering mandates an investigation and exploration of a defense prior to its announced submission to a jury. The failure to interview the alibi witness deprived counsel and more importantly, deprived the defendant of the basis to make an informed tactical decision as to the defense of Mr. Banks. The defendant's defense was thereby undermined. He was left with none for which reasonable doubt could be provided and he was convicted.

Moreover, the second prong of [*Strickland, Fritz* and *Cronic see infra*], in this Court's opinion, is such that there is indeed a reasonable probability or a substantial likelihood exists, in this Court's mind, that the deficiency in this instance on the part of counsel may have contributed to the adverse outcome for the defendant. That the deficiency leading to the defense, a defense without merit, would contribute to the jury's perception of the defendant perpetrator.

On appeal, the State argues that the judge erred in granting defendant's petition. It asserts that the judge's decision was premised on the theory that defense counsel promised to deliver a classic alibi defense and further, even if counsel did not make such a promise, counsel was entitled to rely on the information provided by defendant with respect to the alibi. Finally, the State contends that defense counsel did not promise anything he did not deliver and that defendant suffered no prejudice as a result of defense counsel's failure to interview Caldwell.

■ For defendant to prevail on his ineffective assistance claim, he must satisfy the test set forth in *Strickland v. Washington*, 466 *U.S.* 668, 694, 104 *S.Ct.* 2052, 2068, 80 *L. Ed.*2d 674, 80 *L. Ed.*2d 674, 698 (1984), and *United States v. Cronic*, 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L. Ed.*2d 657 (1984), which our Supreme Court adopted in *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). *See also State v. Preciose*, 129 *N.J.* 451, 463–64, 609 *A.*2d 1280 (1992)

(acknowledge the adoption of the test). Under the *Strickland–Cronic–Fritz* test, defendant must demonstrate that: (a) "counsel's performance was deficient;" and (b) "there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Preciose, supra,* 129 *N.J.* at 463–64, 609 *A.*2d 1280.

Here, we agree that defendant's counsel should have interviewed Caldwell prior to having her testify, but cannot conclude that the result of defendant's trial would have been different had counsel conducted such an interview. We are satisfied that an interview of Caldwell by defense counsel would have revealed no different version of events than Caldwell testified to during the trial. An examination of Caldwell's testimony reveals that an interview would have told counsel that at approximately the time of the robbery, defendant was with Caldwell or at his home.

Caldwell testified that she and defendant left her home in Elizabeth "between 7:00 a.m. and 7:30 a.m." She stated that they had to take two buses, one from Elizabeth to Newark and the other from a location in Newark to the area of defendant's home. She testified that she and defendant were on the second bus between 7:30 a.m. and 8:00 a.m.

She testified that defendant was in his home at 8:30, but admitted that she was not with him at the time. Although, during the contentious cross-examination by the prosecutor, Caldwell admitted that she did not know where defendant was at 8:30 a.m., she testified on re-direct that because she was not "pay[ing] particular attention to the time," defendant could have arrived at his house after 8:30 a.m., after the robbery had occurred.

The Law Division judge must have concluded that if defense counsel had interviewed Caldwell and learned the content of her proposed testimony, then defense counsel would not have called her as a witness. Our dissenting colleague contends that had defense counsel interviewed Caldwell before trial, she would not have been called as a defense witness, or counsel's opening

statement "would not have so depended on alibi." We can reach no such conclusion from this record. It is highly likely in our view that counsel would have still called Caldwell as a witness. Her testimony was such that if believed, along with the other proofs, a reasonable jury could have concluded that defendant was not the perpetrator of the robbery.

Further, defense counsel attempted to interview Caldwell before trial, but was unable to do so because she could not be located. In this regard, counsel relied on defendant's representations to make his opening statement.

Moreover, the Law Division judge and our dissenting colleague, in their opinions, treat the alibi defense as if it were a "separate defense." *State v. Garvin, supra,* 44 *N.J.* at 272, 208 *A.*2d 402. It is not. "It is part and parcel of a direct denial of the State's charge whenever the defendant's physical presence at a given time and place is a critical part of the prosecutor's case." *Ibid. See also State v. Mucci,* 25 *N.J.* 423, 431, 136 *A.*2d 761 (1957); *State v. Nunn,* 113 *N.J.Super.* 161, 167, 273 *A.*2d 366 (App.Div.1971).

Here, defendant's defense was simply that he was not the perpetrator of the robbery, and, as part of his direct denial, he produced the testimony of Caldwell, his girlfriend, who was with him around the time the robbery took place. Caldwell's testimony was consistent with the notice of alibi that set forth that she would testify that defendant was with her "around the time of the alleged incident."

We are satisfied that, had counsel interviewed Caldwell prior to trial, he would have learned then what she ultimately testified to during her direct and re-direct testimony. An interview that revealed what Caldwell testified to on those two occasions would not have caused counsel to forego using her as a witness. Moreover, we doubt that counsel's opening statement would have been different based on the interview in that Caldwell, at least inferentially, placed defendant at a different location at around the time of the robbery.

The dissent's view, essentially, allows defendant to have it both ways. We have no doubt that had defense counsel not called Caldwell as a witness, defendant would have filed a petition for post-conviction relief, contending that the failure to call Caldwell as a witness constituted ineffective assistance of counsel. Considering the circumstances here, not calling Caldwell as a witness might reasonably be considered ineffective assistance of counsel.

Further, with the information counsel learned from defendant, he was prudent in providing the notice of alibi pursuant to *Rule* 3:12–2.

> Whether the testimony of the proposed witness shows directly that a defendant was not physically present at the precise time and place of the alleged offense, or does so only inferentially, its purposes and objectives are the same. The difference is the weight and degree of persuasiveness attributed to that testimony by the jury. There is no less reliance by defendant on such testimony nor less need for notice by the State that it will be offered.
>
> [*State v. Nunn, supra,* 113 *N.J.Super.* at 168, 273 *A.*2d 366.]

Here, Caldwell, during her cross-examination, was not particularly helpful to defendant's case, but that is not a basis to conclude that counsel was ineffective because he failed to interview her. The same cross-examination would have occurred whether she was interviewed or not. Caldwell's testimony during direct and re-direct examination was not damaging to defendant's case.

Finally, counsel relied on defendant's representations in deciding what defense to present. In fact, defendant signed the notice of alibi along with his counsel. Given the circumstances from a defense perspective, particularly that only defendant and Caldwell knew about defendant's whereabouts around the time of the robbery, we cannot conclude that counsel's reliance on defendant's representations about an alibi constitutes ineffective assistance of counsel. *Cf. State v. Sloan,* 226 *N.J.Super.* 605, 615, 545 *A.*2d 230 (App.Div.) *certif. denied,* 113 *N.J.* 647, 552 *A.*2d 171 (1988).

Reversed.

WELLS, J.A.D. (dissenting).

I would affirm for substantially the reasons given by the trial judge in his oral opinion. *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984) requires that two prongs be met to establish a claim of ineffective assistance of counsel. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defendant.

As to the first prong, the majority concedes only that counsel "should have interviewed Caldwell prior to having her testify." But the trial judge found that "[t]his error was so serious as to fall in this instance below what is expected ... under the Sixth Amendment and the New Jersey Constitutional guarantee of effective assistance of counsel." I agree with that assessment and would, therefore, expressly conclude that the first prong of *Strickland* was met.

It is a clear error of professional judgment in a criminal case not to interview an important alibi witness before that witness takes the stand.[1] Counsel had two chances to interview Caldwell.

---

[1] *See* Leonard N. Arnold, *New Jersey Practice,* § 961 (1999–2000) ("Interview all witnesses."); John S. Applegate, *Witness Preparation,* 68 *Tex. L.Rev.* 277, 287 (1989) ("The practical literature uniformly views the failure to interview witnesses prior to testimony as a combination of strategic lunacy and gross negligence."); Steven Lubet, *Modern Trial Advocacy: Analysis and Practice* at 79 (2nd ed. 1997) ("[I]t is generally considered incompetent for a lawyer to fail to meet with and prepare a witness in advance of offering her testimony."); *U.S. v. Brant,* 1993 WL 313369 (E.D.Pa.1993), *aff'd, U.S. v. Snead,* 27 *F.*3d560 (3rd Cir.1994), *cert. denied, Snead v. U.S.,* 513 *U.S.* 909, 115 *S.Ct.* 278, 130 *L. Ed.*2d 194 (1994). (finding that an attorney who cross-examined prosecution eyewitnesses without first having interviewed those witnesses had violated "an ancient principle of cross-examination, recognized by advocates for millennia: never ask a question to which you do not already know the answer.") Most of the decided cases involving ineffective assistance claims that are premised on faulty witness preparation ultimately rest upon the failure of defense counsel to interview *or call* witnesses proposed by the defendant. Most of these claims fail because the defendant cannot establish prejudice in not calling any particular witness. *See e.g. State v. Bey,* 161 *N.J.* 233, 736 *A.*2d 469 (1999), *cert. denied, Bey v. New Jersey,* 530 *U.S.* 1245, 120 *S.Ct.* 2693, 147 *L. Ed.*2d 964, (2000). The case, *sub*

The first opportunity came on Thursday, February 1, 1996, when she appeared at the courthouse but was not reached by the time of evening recess. The second chance occurred when she belatedly appeared after lunch on Tuesday, February 6, just before she was called to the stand.

It is true, as the State argues, that counsel is entitled to rely on the representations of his client in developing defenses and in deciding what witnesses to interview or not to interview. *State v. Sloan,* 226 *N.J.Super.* 605, 615, 545 *A.*2d 230, *certif. denied,* 113 *N.J.* 647, 552 *A.*2d 171 (1988). But such reliance does not extend to calling an alibi witness without interviewing her. So potent is alibi testimony that not to be certain as to precisely what such a witness will say is to invite the serious prejudice that occurred here.

Even assuming that the benefits of an alibi defense were worth the risk of mentioning it to the jury even though counsel was unable to discuss it with Caldwell prior to the start of trial, I also conclude that the judge was correct in finding it deficient performance not to have confirmed the details of the alibi with the witness when defense counsel had the opportunity to do so. Counsel could have conducted a brief interview when Caldwell appeared on Thursday, or he could have asked the trial judge for an opportunity to do so just before she took the stand the following Tuesday. I am not unmindful that the patience of the court and jury had been sorely strained at that point in the trial by Caldwell's tardy appearance. But I nevertheless deem it a significant omission that counsel did not at least try to seek a brief recess to interview her.

Second, the failure of Caldwell to place the defendant with her at the time of the crime prejudicially damaged the claim of misidentification by Carter. Had the jurors harbored doubts

---

*judice,* is gratifyingly rare because very infrequently does an uninterviewed friendly witness take the stand and proceed to so deeply wound the very side for which the witness was called.

about Carter's testimony or questions concerning her identification of Banks, those doubts and questions surely paled in the face of the failed alibi.

The defense rested on the doubt raised by a very stressed victim's identification, the failure to locate the gun and the jewelry and, most importantly, the alibi. When the alibi failed the whole defense case lost credibility. I respectfully disagree with the majority's speculation that had counsel interviewed Caldwell, she probably would have been called as a witness anyway. Its view is that Caldwell's testimony, notwithstanding her concession that she was not with Banks at 8:30 a.m., could still raise a doubt as to Banks' participation in the crime, because Caldwell was not paying particular attention to the time, they had just arrived in Newark perhaps as late as 8:00 a.m., and then went to Banks' house. But they then separated and Caldwell left for an appointment. She only surmised that Banks remained at his house and she specifically denied they were together at 8:30 a.m. If counsel had been able to interview her before the start of trial, his opening would not have so depended on alibi. If he had interviewed her before she testified, had she been called at all, her interrogation on the stand would have been quite different.

In contrast to the majority, however, I see little chance that had she been interviewed she would have been called. Without Caldwell's testimony that she and Banks were together at 8:30 a.m., she adds little of probative value to the defense case. In fact, her admission that they had separated by 8:30 a.m. not only seriously detracts from viable defense arguments regarding the victim's identification, but also places Banks near the scene of the robbery *before* it occurred, something none of the State's other witnesses did.

Had the defense of alibi not been mentioned to the jury and Caldwell not been called to the stand, doubt could well have been engendered in the minds of some jurors as to the victim's identification as the result of (1) the stress that Carter, the victim, was under; (2) the evidence of the suspect's changes in clothing and

hairstyle between the robbery and the chance sighting of Banks later in the morning; (3) the failure to find the gun and jewelry; and (4) the improbability of a robber returning to the scene so quickly after the crime—facts urged upon the jury during the opening. But when Caldwell's testimony unexpectedly did not cover the time of the robbery and it happened that his house was within a few blocks of the crime, reasonable doubts about the State's case in the minds of jurors could not have but been dispelled to Banks' great prejudice. Thus, the second prong of the *Strickland* standard is established.